UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. ) |
| WESTPORT CAPITAL MARKETS, LLC, and CHRISTOPHER E. MCCLURE, | ) ) ) ) **JURY TRIAL DEMANDED** |
| Defendants. | ) ) ) |

# COMPLAINT

Plaintiff United States Securities and Exchange Commission ("Commission") alleges the following against Defendants Westport Capital Markets, LLC ("Westport") and Christopher E. McClure ("McClure") (collectively, "Defendants"), and hereby demands a jury trial:

## SUMMARY OF THE ACTION

1. Westport and McClure were investment advisers who had a fiduciary duty to their investment advisory clients and were obligated to manage their clients' investments in the clients' best interests. Instead, they violated their fiduciary duty and defrauded their clients. Westport and McClure obtained standing authority to make investment decisions in client accounts, and misused that authority when they repeatedly purchased securities in client accounts that generated undisclosed mark-ups and fees for themselves. The undisclosed mark-ups and fees that Westport and McClure generated for themselves were on top of the advisory fees that these clients already paid Westport to manage their investments. The securities that generated undisclosed mark-ups for Westport and McClure were risky and caused substantial losses for clients, including for at least one client who had told McClure to invest his accounts

conservatively.  Across Westport's advisory client accounts, the undisclosed mark-ups and fees totaled approximately $780,000.

2. From March 2012 until June 2015, Westport and McClure received undisclosed mark-ups when Westport, acting as principal, sold securities from its proprietary brokerage account to client accounts.  Federal law requires investment advisers to obtain client consent — prior to the completion of each transaction — when selling securities from an adviser's own account to a client.  To enable clients to provide informed consent, Westport was required to provide clients with sufficient information for clients to make an informed decision.  Westport was thus required — but failed — to disclose its financial conflict of interest to clients.  Clients were deprived of key information they needed to evaluate Westport's and McClure's financial motives in buying these risky securities in their accounts.

3. Further, in its capacity as a broker-dealer, Westport accepted mutual fund distribution fees, known as 12b-1 fees, when Westport and McClure invested advisory clients in certain mutual fund share classes.  Westport and McClure did not tell their advisory clients that the clients' mutual fund investments generated this additional form of compensation for Westport and McClure.  In some instances, Westport and McClure invested their clients in mutual fund share classes that charged a 12b-1 fee even when a share class of the same fund was available without a 12b-1 fee.

4. Through the conduct alleged herein, Westport and McClure breached the fiduciary duty that they owed to their investment advisory clients, by defrauding those clients, failing to make investment decisions in the best interest of those clients, and failing to disclose their conflicts of interest.

## JURISDICTION AND VENUE

5. The Commission seeks a permanent injunction and disgorgement pursuant to Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)]. The Commission seeks further equitable relief in the form of a conduct-based injunction pursuant to Section 21(d)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78u(d)(5)]. The Commission seeks the imposition of a civil penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

6. The Court has jurisdiction over this action pursuant to Sections 209(d), 209(e), and 214 of the Advisers Act [15 U.S.C. §§ 80b-9(d), 80b-9(e), 80b-14].

7. Venue is proper in this District under Section 214 of the Advisers Act [15 U.S.C. § 80b-14] and 28 U.S.C. § 1391(d) because, among other things, certain acts or transactions constituting the violations of the federal securities laws detailed herein occurred in this district and because, at all relevant times, Westport's principal place of business was in Connecticut and McClure was a resident of Connecticut.

8. In connection with the conduct described in this Complaint, Defendants directly or indirectly made use of the mails or the means or instruments of interstate commerce.

9. Defendants' conduct involved fraud, deceit, or deliberate or reckless disregard of regulatory requirements, and resulted in substantial loss, or significant risk of substantial loss, to other persons.

## DEFENDANTS

10. **Westport**, located in Westport, Connecticut, is a dually registered investment adviser and broker-dealer. Westport first registered as an investment adviser with the Commission in 1997. Westport has been registered as a broker-dealer since 1996. During the

relevant period, advisory clients paid Westport advisory fees in exchange for investment advice and the management of their accounts.

11.     **McClure** is Westport's President, Chief Executive Officer, Chief Financial Officer, and Chief Compliance Officer.  Since 2007, McClure has controlled Westport and has been the sole or majority owner of Westport.  He is a resident of Fairfield, Connecticut.  At all relevant times, McClure personally advised certain Westport clients, had authority to make investment decisions for certain clients, and received compensation for providing investment advice and for managing client accounts.

## FACTUAL ALLEGATIONS

**A. Westport's Advisory Business.**

12.     Westport and McClure provide advisory services to a variety of clients, including retirees and elderly persons who rely on investments in their Westport advisory accounts for income.  Westport's clients also include trusts and retirement plans.  These advisory services include both Westport's investment advice and the management of clients' investment portfolios.

13.     For these advisory services, Westport's clients pay an advisory fee to Westport, which is an agreed-upon percentage applied to the value of the client's assets under the firm's management.  The fee is periodically deducted from clients' advisory accounts.

14.     As investment advisers, Westport and McClure are fiduciaries for their advisory clients.  As such, they owe their clients an affirmative duty of utmost good faith, are obligated to provide full and fair disclosure of all material facts, and have an affirmative obligation to employ reasonable care to avoid misleading their clients.  Westport's and McClure's duty to disclose to clients all material facts includes a duty to tell clients about all of Westport's and McClure's actual or potential conflicts of interest.

**B. Westport and McClure Generated Undisclosed Mark-Ups for Themselves Through Their Trading in Client Accounts.**

15. Beginning in 2011, Westport entered into arrangements to act as a selling dealer ("Selling Dealer") with investment banks that underwrote, managed, co-managed, or represented underwriters in initial or secondary offerings of securities (hereafter, "Underwriters").

16. When participating as a Selling Dealer, Westport purchased shares of offerings (hereafter, "Syndicate Offerings") in its own brokerage account at a discount to the offerings' public offering prices. Then, acting as principal for its own account, Westport sold those securities to its advisory clients' accounts at the full public offering prices. By doing so, Westport pocketed a "mark-up" equal to the difference between the discounted offering price that it paid for the shares and the full offering price at which Westport sold the shares to its clients. Westport sold Syndicate Offerings to investment advisory clients' accounts through this arrangement beginning in 2011, and then consistently from March 2012 through June 2015.

17. In addition to obtaining the mark-ups as a Selling Dealer, Westport also received advisory fees that were calculated based on the value of the clients' ongoing investments in the Syndicate Offerings.

18. Westport and McClure knew the per-share mark-up that Westport would receive as Selling Dealer when they invested client funds in Syndicate Offerings. When an Underwriter notified Westport and McClure of a new offering, typically by email, the notification typically specified the amount of the mark-up, described as a "selling concession," that Westport would receive when acting as a Selling Dealer for that security. On several occasions, when an Underwriter's notice of a new offering omitted the amount of the mark-up, McClure specifically asked about it before investing his clients' funds in that offering.

5

19. Westport and McClure sold shares of the Syndicate Offerings to accounts belonging to clients who had previously entrusted them with standing authority to buy and sell securities in, and make investment decisions for, those accounts ("Discretionary Accounts"). As fiduciaries with responsibility over Discretionary Accounts, Westport and McClure were legally required to make investment decisions that were consistent with the clients' objectives and in their clients' best interests. They were also required to disclose all conflicts of interest. Westport and McClure did not inform clients that Westport and McClure benefited financially from the investment decisions that they made in Discretionary Accounts.

20. Westport and McClure sold to individual Discretionary Accounts enough shares of Syndicate Offerings to generate mark-ups totaling hundreds of dollars per account, per offering. Many of the Syndicate Offerings had a public offering price of $25.00 per share with Westport receiving a $0.50 mark-up per share, meaning that Westport immediately gained for itself 2% from every share it sold to a client. On several other Syndicate Offerings, Westport gained over 3% per share from the mark-up.

21. Westport received a total of $650,000 in Syndicate Offering mark-ups from advisory client accounts during the relevant period. McClure generated approximately $530,000 of the $650,000 in mark-ups for Westport, by placing money that his clients had entrusted to him in the Syndicate Offerings.

22. During Westport's fiscal years 2012 through 2015, advisory clients paid the firm approximately $1.7 million in advisory fees. The $650,000 in undisclosed Syndicate Offering mark-ups increased Westport's compensation from fee-paying advisory clients by about 38%. The $530,000 in mark-ups from McClure's clients increased Westport's compensation from fee-

6

paying advisory clients by about 30%.  McClure obtains compensation from Westport's net income.

23. The Syndicate Offerings were regularly available to Westport, allowing Westport and McClure to trade them frequently in client accounts and repeatedly to pocket undisclosed mark-ups.  Westport and McClure sometimes held Syndicate Offerings in client accounts for only a short period before investing the client in another Syndicate Offering and generating another mark-up.

24. Investments in the Syndicate Offerings resulted in net losses for many of Westport's and McClure's clients.  Cumulatively, their advisory clients' accounts that were invested in Syndicate Offerings have lost approximately $1.2 million to date as a result of these investments, with approximately $890,000 in realized losses.

### C. Westport and McClure Misled and Deceived Clients Regarding Westport's Compensation, and Acted Contrary to a Client's Express Objectives.

25. Holdings in Syndicate Offerings were included in advisory clients' assets under management for purposes of calculating their advisory fee.  Westport and McClure thus were compensated from those investments twice, first from the Syndicate Offering mark-ups, and second from the advisory fees applied to the value of those holdings.

26. For some client accounts, the amount of undisclosed Syndicate Offering mark-ups equaled 70 percent or more of the amount of advisory fees paid by that account.  At least two client accounts generated more in Syndicate Offering mark-ups than in advisory fees.

27. In June 2012 a client of McClure's entered into Westport's Investment Management Agreement, which provided that "Westport Capital Markets, LLC will have full discretion to act on your behalf regarding all purchases and sales of securities in your portfolio"

but that "[a]ll transactions will be made in accord with your stated objective." The agreement further provided that the client would pay Westport an advisory fee based on assets under Westport's management. McClure had previously emailed the client with proposals for managing the client's accounts. McClure included a proposal that the client "be disengaged from the process and have me manage the accounts on a discretionary basis." McClure also asked the client how he would like to compensate Westport, writing "[t]he two choices are compensation on a transaction basis *or* on a fee based on a percentage of assets managed." (emphasis added). Within a month of the client signing Westport's Investment Management Agreement and agreeing to compensate Westport with an advisory fee, McClure invested the client's funds in several Syndicate Offerings that generated over $2,000 in mark-ups for Westport. From 2012 to 2015, the client paid Westport a total of over $138,000 in advisory fees. By investing the client's two advisory accounts in Syndicate Offerings a total of 145 times during that period, Westport received additional compensation in the form of undisclosed mark-ups totaling over $130,000. Westport's and McClure's representations to the client regarding Westport's fee-based compensation were false and misleading because they failed to disclose that Westport and McClure also generated mark-ups from investments they made with the client's funds.

28. The client referenced in paragraph 27 had told McClure that he wanted his accounts to be invested conservatively, with a goal of generating income but erring on the side of not losing money. Instead, Westport and McClure defrauded the client by acting contrary to the client's stated objectives and repeatedly investing in Syndicate Offerings that generated undisclosed mark-ups for Westport. The Syndicate Offerings exposed the client to significant risk that the client did not want to take, while generating secret mark-ups for Westport. The

8

client suffered significant losses from the Syndicate Offerings, which included investments in (i) heavily indebted companies in the volatile business of oil and gas exploration, (ii) notes offered by a Greek penny stock shipping company that had three straight years of declining earnings and insufficient cash to service its outstanding liabilities, and (iii) a closed-end fund that had no operating history, with a speculative investment strategy that included investment in junk bonds.  McClure invested the client's funds in those sorts of risky securities only when they generated a mark-up for Westport.  Over 90% of the purchases that McClure made in the client's advisory accounts were purchases of Syndicate Offerings.  In June and July 2013, 25% of the client's combined account value was invested in Syndicate Offerings, and between 10% and 20% was invested in Syndicate Offerings for months thereafter.  In 2015, the client removed his accounts from Westport after a financial professional at another firm alerted the client to the riskiness of the Syndicate Offerings.  The client's net losses in Syndicate Offerings were approximately $245,000.

29.     In May 2013, McClure emailed another client to recommend converting an existing account into "a fee based account."  The client agreed.  Within weeks of the client signing Westport's Investment Management Agreement and agreeing to open a fee-paying Discretionary Account, McClure purchased in the account Syndicate Offerings that generated thousands of dollars in mark-ups for Westport.  In 2013 and 2014, the account paid Westport a total of over $121,000 in advisory fees.  By investing the account in 41 Syndicate Offerings over an 18-month period in 2013 and 2014, Westport received additional compensation in the form of undisclosed mark-ups totaling over $87,000.  Westport's and McClure's representations to the client regarding Westport's fee-based compensation were false and misleading because they failed to disclose that Westport and McClure also generated mark-ups from investments they

9

made with the client's funds.

**D. Westport Acted as Principal in Syndicate Offering Sales to Advisory Client Accounts But Failed to Disclose its Conflict of Interest or Obtain Client Consent.**

30. When Westport sold Syndicate Offering shares from its own account to its clients' accounts, Westport acted as principal. Section 206(3) of the Advisers Act requires investment advisers such as Westport to obtain client consent for principal transactions before the transactions are completed. To comply with Section 206(3), investment advisers are required to provide advisory clients with sufficient information to allow clients to make an informed decision as to whether to consent to the transaction. Here, Westport's own policies and procedures governing principal transactions with advisory clients required the firm to disclose to clients the cost to Westport of any security proposed to be sold to the client, and to obtain client consent. In the case of the Syndicate Offerings, that would have required Westport to reveal its mark-up, which Westport did not do. Westport did not obtain client consent, much less informed client consent.

31. McClure exercised complete control over Westport, and Westport's policies and procedures vested him with responsibility, as Chief Compliance Officer, to ensure full disclosure to clients and to obtain client consent regarding principal trades. With respect to his own advisory clients, McClure selected client accounts to which to sell the Syndicate Offerings, and in what amounts.

**E. Westport and McClure Failed to Disclose to Advisory Clients Westport's Receipt of Mutual Fund 12b-1 Fees and Invested Clients in Mutual Fund Share Classes that Charged a 12b-1 Fee when a Cheaper Share Class was Available.**

32. Mutual funds offer different share classes, which each represent an investment in the same investment strategy and portfolio of securities, but with different costs and fees.

Typically, Class A shares are purchased by retail brokerage customers in brokerage accounts, but also can be purchased by retail advisory clients in advisory accounts. Class A shares are sold with sales charges in retail brokerage accounts based on the dollar amount of the investment, but the sales charges are generally waived when purchased in fee-based advisory accounts, like Westport's advisory accounts. Many of Westport's representatives purchased Class A shares for their advisory clients during 2012 to 2017. McClure almost exclusively decided to invest his clients' assets in Class A shares of mutual funds when he purchased mutual funds for them.

33. Even sales charge-waived Class A shares purchased in fee-based advisory accounts may continue to pay a so called "12b-1 fee", which is an ongoing annual marketing and distribution fee. 12b-1 fees are paid by a fund to its distributor or underwriter, which then pays the fees to intermediary broker-dealers like Westport that distribute the fund's shares. In its capacity as a broker-dealer, Westport accepted 12b-1 fees from mutual funds that it sold to its advisory clients, and then shared the 12b-1 fees with its representatives as compensation. The typical 12b-1 fee for Class A shares in Westport advisory accounts was 25 basis points (or 0.25%), annually, based on the value of advisory clients' holdings in that share class.

34. From 2012 to 2017, Westport and McClure invested certain of their advisory clients' assets in mutual fund share classes with 12b-1 fees, which were paid to Westport, but Westport and McClure did not disclose their receipt of those fees to clients. Westport and McClure did so many times — even when lower-fee share classes of the same funds without 12b-1 fees were available. Based on advisory clients' year-end or partial year-end holdings in Class A shares of mutual funds, Westport has received approximately $130,000 from 12b-1 fees that were charged to its advisory clients. McClure received compensation from 12b-1 fees because they contributed to Westport's net income.

35. Westport and McClure had a conflict of interest when they decided to invest their clients' money in mutual fund share classes that resulted in 12b-1 fees for Westport, which they had a duty to disclose, but that they did not disclose.

36. When Westport or McClure invested advisory clients' assets in mutual fund share classes with 12b-1 fees despite the availability of a share class of the same fund without 12b-1 fees, Westport and McClure breached their fiduciary duty to seek best execution for their clients.

**F.    Westport and McClure Made Untrue Statements and Omissions of Material Fact in Forms ADV.**

37. As an investment adviser registered with the Commission, Westport was required to file and annually update disclosures in Forms ADV. Westport was also required to provide advisory clients with certain disclosures in brochures and brochure supplements on Forms ADV Part 2A and Part 2B.

38. Item 8.A of Form ADV Part 1 asks "Do you or any *related person* . . . buy securities for yourself from advisory *clients*, or sell securities you own to advisory *clients* (principal transactions)?" In Forms ADV filed on or about 2/9/2012, 9/18/2012, 9/16/2013, and 9/25/2014, all during the period in which Westport acted as a Selling Dealer and sold securities from its own account to advisory clients, Westport responded "No" to Item 8.A. These statements were untrue at the times they were made.

39. McClure signed each of the Forms ADV Part 1, and certified under penalty of perjury that the information and statements made in each Form ADV Part 1 were true and correct.

40. Investment advisers are required to describe in a client brochure, Part 2A, Item 5, of Form ADV, how the adviser is compensated for advisory services. In addition to describing

the adviser's fee arrangement, advisers are required to disclose if the adviser or its supervised persons accept service fees from the sale of mutual funds, and to explain the conflict of interest presented by this practice.  In Part 2A, Item 5, of Forms ADV filed in at least February 2012, September 2012, September 2013, September 2014, September 2015, and August 2016, Westport failed to disclose that it and its supervised persons accepted 12b-1 fees for the sale of mutual funds to advisory clients, and failed to explain how that practice presented a conflict of interest.  These failures were omissions of material fact required to be stated in Part 2A of Form ADV.

      41.    When signing Forms ADV Part 1, McClure certified under penalty of perjury that information and statements made in exhibits and any other information submitted, which includes Part 2A, were true and correct and did not omit material information.

      42.    Investment advisers are required to disclose in a brochure supplement, Part 2B, Item 4, of Forms ADV, the forms of compensation of supervised persons beyond the fees and compensation disclosed in Part 2A, Item 5.  During the period that Westport's supervised persons accepted compensation from 12b-1 fees, Westport failed to disclose that compensation in Part 2B, Item 4, of Forms ADV dated at least February 2012, September 2012, September 2013, September 2014, and March 2015.  These failures were omissions of material facts required to be stated in Form ADV.  Westport attached its Forms ADV Part 2B dated September 2012, September 2013, and September 2014 to Forms ADV Part 2A filed with the Commission.

      43.    When signing Forms ADV Part 1, McClure certified under penalty of perjury that information and statements made in exhibits and any other information submitted, which includes Part 2B, were true and correct and did not omit material information.

## **FIRST CLAIM FOR RELIEF**

### **Westport and McClure**
### **Violated Section 206(1) of the Advisers Act**

44. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 43 above as if set forth fully herein.

45. Westport and McClure are "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Westport is registered with the Commission as an investment adviser. Westport and McClure each are in the business of providing investment advice concerning securities for compensation. McClure is also an investment adviser due to his ownership, management, and control of Westport.

46. Westport and McClure, acting intentionally, knowingly, or recklessly, employed a scheme to defraud advisory clients by deceiving advisory clients regarding the compensation generated from their accounts.

47. Westport and McClure, acting intentionally, knowingly, or recklessly, employed a scheme to defraud advisory clients by using advisory clients' grant of discretion over their accounts to trade in Syndicate Offerings that generated undisclosed mark-ups.

48. Westport and McClure intentionally, knowingly, or recklessly concealed mark-ups received from advisory client accounts, because they knew, or were reckless in not knowing, that reasonable advisory clients would question, challenge, or refuse the transactions in their account.

49. Westport and McClure intentionally, knowingly, or recklessly invested advisory clients in mutual fund share classes with 12b-1 fees in instances when lower-fee share classes of the same funds without 12b-1 fees were available.

50. As set forth above, Westport and McClure, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, employed or are employing a device, scheme, or artifice to defraud advisory clients. In so doing, Westport and McClure have breached their fiduciary duties.

51. As a result, Westport and McClure have violated and, unless enjoined, will continue to violate, Section 206(1) of the Advisers Act [15 U.S.C. § 80b-6(1)].

## SECOND CLAIM FOR RELIEF

### Westport and McClure
### Violated Section 206(2) of the Advisers Act

52. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 43 above as if set forth fully herein.

53. Westport and McClure are "investment advisers" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Westport is registered with the Commission as an investment adviser. Westport and McClure each are in the business of providing investment advice concerning securities for compensation. McClure is also an investment adviser due to his ownership, management and control of Westport.

54. The Syndicate Offering mark-ups received by Westport and McClure presented an actual or potential conflict of interest that Westport and McClure knew or should have known was required to be disclosed to their advisory clients. Westport and McClure failed to disclose to advisory clients that they received mark-ups from the Syndicate Offerings and failed to disclose their resulting conflict of interest.

55. The 12b-1 fees received by Westport and McClure presented an actual or potential conflict of interest that Westport and McClure knew or should have known was

required to be disclosed to their advisory clients. Westport and McClure failed to disclose to advisory clients that they received compensation from 12b-1 fees and failed to disclose their resulting conflict of interest.

56. Westport and McClure acted negligently, and violated applicable standards of care, in making material misrepresentations and omissions, and in breaching their fiduciary duties, when investing advisory clients in the Syndicate Offerings and in mutual fund share classes that incurred a 12b-1 fee.

57. As set forth above, Westport and McClure, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, engaged or are engaging in transactions, practices, or courses of business which operate as a fraud or deceit upon advisory clients.

58. As a result, Westport and McClure have violated and, unless enjoined, will continue to violate, Section 206(2) of the Advisers Act [15 U.S.C. § 80b-6(2)].

## THIRD CLAIM FOR RELIEF

### Westport Violated Section 206(3) of the Advisers Act

59. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 43 above as if set forth fully herein.

60. Westport is an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Westport is in the business of providing investment advice concerning securities for compensation and is registered with the Commission as an investment adviser.

61. When it acted as a Selling Dealer in Syndicate Offerings, Westport acted as principal for its own account.

62. Westport, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting as principal for its own account, knowingly sold securities to advisory clients, without providing sufficient disclosure of Westport's conflict of interest or obtaining the consent of the clients to such transactions.

63. As a result, Westport violated and, unless enjoined, will continue to violate, Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)].

## FOURTH CLAIM FOR RELIEF

### McClure Aided and Abetted Westport's Violation of Section 206(3) of the Advisers Act

64. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 43 above as if set forth fully herein.

65. Westport is an "investment adviser" within the meaning of Section 202(a)(11) of the Advisers Act [15 U.S.C. § 80b-2(a)(11)]. Westport is in the business of providing investment advice concerning securities for compensation and is registered with the Commission as an investment adviser.

66. When it acted as a Selling Dealer in Syndicate Offerings, Westport acted as principal for its own account.

67. Westport, by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly, acting as principal for its own account, knowingly sold securities to advisory clients, without providing sufficient disclosure of Westport's conflict of interest or obtaining the consent of the clients to such transactions.

68. McClure knowingly or recklessly rendered substantial assistance to Westport's violations of Section 206(3) of the Advisers Act by, among other things, directing that Westport

sell the Syndicate Offerings to its advisory clients, failing to make full disclosure to advisory clients, and failing to obtain advisory clients' consent to Westport's conflicted role in the Syndicate Offerings.

69. As a result, McClure aided and abetted, and unless enjoined will continue to aid and abet, Westport's violation of Section 206(3) of the Advisers Act [15 U.S.C. § 80b-6(3)] and is liable under that section pursuant to Section 209(f) of the Advisers Act [15 U.S.C. § 80b-9(f)].

## FIFTH CLAIM FOR RELIEF

### Westport and McClure
### Violated Section 207 of the Advisers Act

70. The Commission repeats and incorporates by reference the allegations in paragraphs 1 through 43 above as if set forth fully herein.

71. Section 207 of the Advisers Act [15 U.S.C. §80b-7] provides that it is unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission under Section 203, or to omit to state in any such application or report any material fact which is required to be stated therein.

72. Westport made untrue statements in Forms ADV filed or deemed filed with the Commission by falsely stating that it did not engage in principal transactions with advisory clients, and by failing to disclose that Westport and its supervised persons accepted 12b-1 fees from the sale of mutual funds and failing to explain how that practice presented a conflict of interest. Those untrue statements and omissions concerning potential conflicts of interest and compensation were material, and concerned information that was required to be disclosed in the Forms ADV.

73. As set forth above, McClure signed Forms ADV Part 1, and certified under penalty of perjury that the information and statements made in each ADV, including exhibits and other information submitted, were true and correct and did not omit required information.

74. As a result, Westport and McClure violated and, unless enjoined, will continue to violate Section 207 of the Advisers Act.

## PRAYER FOR RELIEF

WHEREFORE, the Commission requests that this Court:

A. Enter a permanent injunction restraining Defendants and each of their agents, servants, employees and attorneys and those persons in active concert or participation with them who receive actual notice of the injunction by personal service or otherwise, including facsimile transmission or overnight delivery service, from directly or indirectly engaging in the conduct described above, or in conduct of similar purport and effect, in violation of Sections 206(1), (2), (3), and 207 of the Advisers Act [15 U.S.C. § 80b-6(1), (2), (3), 80b-7];

B. Require Defendants to disgorge their ill-gotten gains, plus pre-judgment interest, with said monies to be distributed in accordance with a plan of distribution to be ordered by the Court;

C. Require Defendants to pay an appropriate civil monetary penalty pursuant to Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)];

D. Enter a permanent injunction pursuant to Section 21(d)(5) of the Exchange Act restraining Defendants from receiving any compensation, beyond an advisory fee, from an advisory client's purchase or sale of securities or other investment products unless the following is disclosed, in writing, before the completion of each transaction: (i) the type of compensation; (ii) the recipients of the compensation; (iii) the amount of compensation (or an annual

approximation of any compensation, such as with trailing fees from mutual funds); and (iv) the corresponding conflict of interest;

  E. Retain jurisdiction over this action to implement and carry out the terms of all orders and decrees that may be entered; and

  F. Award such other and further relief as the Court deems just and proper.

## JURY DEMAND

  The Commission hereby demands a trial by jury on all claims so triable.

    Respectfully submitted,

    SECURITIES AND EXCHANGE COMMISSION

    By its attorneys,

    /s/ *Michael C. Moran*

    Michael C. Moran (Mass. Bar No. 666885,
     CT phv08741)
    Kathleen Burdette Shields (Mass. Bar No. 637438, CT phv04710)
    Robert Baker (Mass. Bar No. 654023)
    Boston Regional Office
    33 Arch Street, 24th Floor
    Boston, MA  02110
    (617) 573-8931 (Moran direct)
    (617) 573-4590 (fax)
    moranmi@sec.gov (Moran email)

    *Local Counsel*:
    John B. Hughes (Fed. Bar No. CT 05289)
    Assistant United States Attorney
    Chief, Civil Division
    United States Attorney's Office
    Connecticut Financial Center
    157 Church Street, 23rd Floor
    New Haven, CT  06510
    (203) 821-3700
    (203) 773-5373 (fax)

DATED:  December 11, 2017