# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE
COMMISSION,
    *Plaintiff*,

    v.

WESTPORT CAPITAL MARKETS LLC. *et*
*al.*,
    *Defendants*.

No. 3:17-cv-02064 (JAM)

## ORDER GRANTING IN PART AND DENYING IN PART
## SEC'S MOTION FOR SUMMARY JUDGMENT

The Investment Advisers Act of 1940 was enacted "to achieve a high standard of

business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S.

180, 186 (1963). To this end, the Act imposes on investment advisers "an affirmative duty of

utmost good faith, and full and fair disclosure of all material facts" about their services to their

clients. *Id.* at 194. In particular, investment advisers must tell their clients about "all conflicts of

interest which might incline an investment adviser—consciously or unconsciously—to render

advice which [is] not disinterested." *Id.* at 191-92.

The Securities and Exchange Commission (SEC) has filed this action under the

Investment Advisers Act against two defendants: an investment company named Westport

Capital Markets, LLC, and its owner and chief executive officer Christopher E. McClure.

According to the SEC, Westport and McClure failed to disclose a conflict of interest they had

due to secret profits they earned from trading on securities in their clients' investment accounts.

The SEC has now moved for summary judgment. I will grant the SEC's motion in part

and deny it in part. On the one hand, I conclude that genuine fact issues remain as to the SEC's

claims that Westport and McClure intentionally or recklessly defrauded their clients and that they willfully made false statements to the SEC. On the other hand, I conclude that no genuine fact issue remains as to the SEC's claims that Westport and McClure negligently failed to disclose their conflicts of interest to their clients and that they failed to advise and obtain their clients' consent to transactions in which they sold securities to their clients as a principal and at a profit from their own account.

## BACKGROUND

Westport is a financial investment company that serves a wide range of clients. McClure owns Westport, and he wears just about every hat of importance in the company: he is the president, chief executive officer, chief financial officer, and chief compliance officer. As the firm's chief compliance officer, McClure is responsible for the accuracy of the firm's financial reports and for understanding what goes into those reports. Doc. #58-1 at 1-3 (¶¶ 1-2, 4).[1]

Westport is dually registered under the securities laws as both a broker-dealer and an investment adviser. When acting as a broker-dealer, Westport carries out its clients' trading orders and is compensated by means of sales commissions. But when acting as an investment adviser, Westport has discretion to decide what trades to make on its clients' behalf, and its clients pay a negotiated annual fee for Westport's services pegged to the size of the account. Doc. #58 at 1. The SEC regulates Westport in its capacity as an investment adviser, while the Financial Industry Regulatory Authority (FINRA) regulates Westport in its capacity as a broker-dealer. Doc. #58 at 1 n.2.

---

[1] McClure's experience prior to joining Westport in 2001 includes a three-year stint as First Vice President at Prudential, as well as lengthier tours at Merrill Lynch and Lehman Brothers. He began his career in 1987 with the U.S. Trust Company. Doc. #47-38.

The trouble for Westport began in 2011 when it entered into arrangements to act as a "selling dealer" for initial or secondary syndicate offerings of securities on the public market. Westport would buy an allocation of newly-offered securities from an underwriter for its own account at a discounted "concession" price and then immediately resell these securities at the (invariably higher) "prevailing market" price to both its brokerage clients and its advisory clients. Over the years, Westport engaged in nearly 1,400 such purchase transactions on behalf of its advisory clients, and more than 1,000 of these transactions involved clients whose accounts McClure personally managed. Doc. #58-1 at 4-5, 10 (¶¶ 9-10, 22).

McClure personally reviewed the trading in Westport's trading accounts on a daily basis, and the daily trading logs showed that the seller-dealer offerings were being sold from Westport's own account to advisory client accounts at a higher price than the discounted price that Westport had paid for them. *Id.* at 28-29 (¶ 57). The sales of these syndicated shares from Westport's account to advisory clients resulted in compensation of about $650,000 for Westport from 2012 to 2015, all of which was over and above the $1.7 million that Westport charged in advisory fees to those same clients. McClure personally received about $530,000 of this $650,000 from Westport clients he personally advised. *Id.* at 6 (¶ 12).

Westport also invested some of its advisory clients' money in mutual funds. Mutual funds have various share classes in which one can invest, and the most important classes for present purposes are "Class A shares," which carry a "12b-1 fee" that is paid by the mutual fund to broker-dealers like Westport, and "institutional class" or "adviser class" shares, which do not. Westport opted to purchase Class A shares for many of its clients between 2012 and 2017, allowing it to earn $105,968 in 12b-1 fees on top of its usual advisory fees and on top of the profits it earned from selling discounted syndicate shares to these advisory clients at the market

rate. McClure personally received compensation from the 12b-1 fees that were attributable to his advisory clients' mutual fund investments. *Id.* at 12-15 (¶¶ 25-26, 28-30).

According to the SEC, Westport could have avoided the 12b-1 fees for $96,834 of the total $105,968 in fees by buying institutional class shares rather than Class A shares. *Id.* at 13 (¶ 29). But Westport and McClure dispute the degree to which they could feasibly have done so, alleging that Westport's trading platform allowed ready access to institutional class shares beginning only in March 2015, and that McClure bought institutional class shares for his clients whenever they were available, after Westport switched to a different trading platform. *Id.* at 13-21 (¶¶ 29-39).

The SEC points to two specific clients of McClure as examples of the defendants' behavior. The first example is Henry Atterbury III, who switched from a brokerage account to an advisory account after McClure suggested that he do so. McClure then bought syndicate shares for Atterbury's account from Westport's account to generate about $134,000 in compensation for Westport due to the difference between the price that Westport paid for the shares and the price that it resold the shares to Atterbury's account. All of this was on top of the $139,000 paid to Westport in quarterly advisory fees. *Id.* at 34-36 (¶¶ 67-69).

The second example is an account held for the executors of the estate of Sylvia Stein. After the executors accepted McClure's suggestion to convert the account from a brokerage account to an advisory account, McClure made purchases of syndicate shares in the manner described above to generate $87,000 in compensation for Westport—on top of the approximately $131,000 charged to the account in advisory fees. In addition, McClure bought mutual fund shares for the account, resulting in yet more compensation for Westport by means of 12b-1 fees. *Id.* at 36-41 (¶¶ 70-73).

The parties agree that all the transactions as described above took place. They also agree that it was a conflict of interest for Westport to be earning this additional compensation and that the Investment Advisers Act required that Westport disclose this conflict of interest to its advisory clients. *Id.* at 21, 30 (¶¶ 41, 61). But Westport or McClure never personally discussed with any of their advisory clients how they were generating additional compensation from transactions involving syndicate share sales or 12b-1 fees. *Id.* at 25, 29-30 (¶¶ 49, 60). Instead of pointing to any client-specific advisories, Westport and McClure contend that they satisfied their disclosure requirements by means of statements they made in certain Investment Adviser Brochures, known as "Forms ADV" that were signed by McClure and that Westport periodically sent to their clients as well as filed with the SEC. *Ibid.*[2]

Westport principally relies on the disclosure that it made in Item 5 of Part 2A of the Forms ADV that it sent to clients and filed with the SEC:

> Where the firm is dually registered as an investment adviser and broker-dealer and licensed to sell various forms of insurance, firm personnel may receive additional commission-based compensation for their work on behalf of the firm. Sales of insurance, mutual funds, initial public offerings (to qualified clients), bonds, and other offerings may result in a commission which is paid in addition to the advisory fee. . . . Receipt of both commission and fee-based compensation create a conflict of interest, as this practice gives the firm and its supervised persons an incentive to recommend products based on the compensation received, rather than on a client's needs. The firm and its supervised persons have a fiduciary obligation to act in the best interest of the firm's clients. Further, clients should note that they are under no obligation to pursue such investment offerings through Westport. Questions regarding the firm's fees

---

[2] A Form ADV is the form that investment advisers must use to register with the SEC, and Part 2 of the Form ADV includes disclosure requirements for a firm's "brochure," which is what an investment adviser provides to prospective clients at the outset of their relationship and to existing clients annually thereafter. *See* 17 C.F.R. §§ 275.203-1, 275.204-3; *In the Matter of the Robare Grp. et al.*, Release No. 4566, at *2 n.3 (Nov. 7, 2016) (explaining regulatory requirements for transmission of Form ADV to clients and to SEC), *review granted in part, decision vacated in part sub nom. Robare Group, Ltd. v. Securities and Exchange Comm'n*, 922 F.3d 468 (D.C. Cir. 2019).

(continued…)

> and/or its advisory/brokerage services may be addressed directly
> with the firm.

Doc. #47-34 at 3 (2013 Forms ADV); *see also* Docs. #47-32 to #47-39 (additional Forms ADV with the same or broadly similar language); Doc. #58-1 at 22-24 (¶¶ 43-44) (relying on and quoting portions of this paragraph).[3] The form explained that "receipt of commission and fee-based compensation create a conflict of interest," but only disclosed that Westport "may" receive such commissions or fees that would create that conflict, rather than the whole truth: that the firm did receive compensation that created a conflict.

Notwithstanding this statement in Part 2A of Westport's Forms ADV, there are other statements in the Forms ADV that are relevant to consideration of the adequacy of Westport's disclosures. For example, despite Westport's undisputed participation as a principal in the sale of syndicate share offerings from its own account to the accounts of its advisory clients, Wesport answered "no" to the question, "Do you or any related person . . . buy securities for yourself from advisory clients, *or sell securities you own to advisory clients (principal transactions)*?" Doc. #58-1 at 45 (¶ 80) (emphasis added) (citing Item 8A(2) of Part 1 of Form ADV). Likewise, Westport did not disclose its receipt of 12b-1 fees in response to a specific query on Item 4 of Part 2B of the Form ADV asking whether Westport or its supervised person (McClure) received "distribution or service ('trail') fees from the sale of mutual funds." Doc. #58-1 at 23 (¶ 44).

Nor did Westport obtain its advisory clients' consent to its acting as a principal in any of the syndicate share transactions *prior* to these transactions taking place. Doc. #58-1 at 31 (¶ 62). After these trades occurred, it sent trade confirmations that indicated that the transaction was

---

[3] Although the 2015 Brochure and certain subsequent Brochures appear to promise that Westport "will" reduce commissions, Westport makes it clear in its statement of facts that these "reductions" were not automatic. *See* Doc. #58-1 at 22 (¶ 42) (admitting only that Westport offset fees "on many occasions" but not invariably); *id.* at 28 (¶ 55) (payment of 12b-1 fees merely "a factor" considered by McClure in setting advisory fees).

being conducted on a principal basis only in a particularly roundabout way, and did not disclose that Westport was generating additional compensation as a result of its principal status. *Ibid.*; Doc. #58-2 at 119-120 (sample trade transaction confirmation; principal status was indicated by listing code "7" under column "C" which, according to the legend in fine print overleaf, corresponded to "Your Broker . . . acted as Principal").

Westport's internal policies prohibited it from engaging in principal transactions with advisory clients absent each client's specific consent. Doc. #58-1 at 29, 33-34 (¶¶ 59, 66); Doc. #47-45 at 4 ("Firm personnel are not permitted to engage in any agency or principal transactions."). But other evidence reflects Westport and McClure's awareness that it was indeed engaging in principal transactions with its clients. For example, McClure told Westport's insurance company in July 2013 that Westport's revenue came from "4% selling group participant . . . when we get paid on an agency basis (the fee is wired to us), [and] 26% . . . when we participate and *get paid on a principal basis* (the fee is part of the selling price)." Doc. #58-1 at 33 (¶ 65) (emphasis added); Doc. #47-46 at 2.

Finally, from 2009 to 2015 Westport contracted with a compliance consulting firm known as Regulatory Compliance, LLC. This firm is not a law firm, and the parties dispute whether it rendered legal advice and the degree to which its advice is significant to the SEC's claims against Westport and McClure. Doc. #58-1 at 48-51 (¶ 83). A substantial question exists whether and to what extent Westport and McClure may rely on their dealings with non-attorneys at Regulatory Compliance to defend against this SEC action. *See generally United States v. Scully*, 877 F.3d 464, 476-78 (2d Cir. 2017) (describing circumstances when a criminal

defendant may rely on advice of counsel). For the most part, except as discussed with respect to Count Three, I need not address these issues to resolve this summary judgment motion.[4]

The SEC's complaint includes five counts. Doc. #1. Count One alleges that Westport and McClure intentionally, knowingly, or recklessly defrauded their clients, in violation of section 206(1) of the Investment Advisers Act, 15 U.S.C. § 80b-6(1). Count Two alleges that Westport and McClure negligently engaged in practices that operated as a fraud or deceit on their clients, in violation of section 206(2) of the Investment Advisers Act, 15 U.S.C. § 80b-6(2). Count Three alleges that Westport sold its advisory clients securities that Westport owned without disclosing to those clients its "principal" status and without obtaining client consent for each transaction, in violation of section 206(3) of the Investment Advisers Act, 15 U.S.C. § 80b-6(3). Count Four alleges that McClure aided and abetted Westport in the conduct complained of in Count Three, in violation of section 209(f) of the Investment Advisers Act, 15 U.S.C. § 80b-9(f). Finally, Count Five alleges that Westport and McClure willfully made untrue statements in their filings with the SEC, in violation of section 207 of the Investment Advisers Act, 15 U.S.C. § 80b-7. The SEC now moves for summary judgment on all counts.

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who

---

[4] In the event that this case proceeds to trial, the SEC may move to preclude evidence or for issuance of limiting instructions to the extent that it is able to show, as a matter of law, that Westport and McClure were not entitled to rely on guidance they received from Regulatory Compliance or that Westport and McClure's dealings with Regulatory Compliance are not otherwise relevant for purposes of the SEC's claims.

opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656-57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### A. Count One – Section 206(1)

Count One alleges that Westport and McClure defrauded their clients, in violation of section 206(1) of the Investment Advisers Act.[5] Section 206(1) "prohibits failures to disclose material information, not just affirmative frauds," *SEC v. Washington Inv. Network*, 475 F.3d 392, 404 (D.C. Cir. 2007), and an investment adviser may violate section 206(1) by failing to disclose material information about the adviser's conflict of interest even if the adviser had no intent to injure his clients and even if his clients were not injured at all. *See Capital Gains*, 375 U.S. at 192; *United States v. Tagliaferri*, 820 F.3d 568, 572 (2d Cir. 2016).

Westport and McClure do not dispute that they engaged in the transactions alleged by the SEC, that they profited from these transactions in excess of the advisory fees they received from their clients, and that they consequently had a conflict of interest that was required to be disclosed under the Act. They contend, however, that there are genuine fact issues about whether they adequately disclosed their conflict of interest to their clients and about whether they acted with the scienter that is required by section 206(1). I will address these two arguments in turn.

---

[5] Section 206(1) provides in relevant part that "[i]t shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly . . . (1) to employ any device, scheme, or artifice to defraud any client or prospective client." 15 U.S.C. § 80b-6(1).

### 1. *Adequacy of disclosures*

Westport and McClure insist that they adequately disclosed their conflicts of interest. As the Supreme Court has made clear, an investment adviser's duty to disclose the grounds for a conflict of interest is broad, because "[t]he Investment Advisers Act of 1940 was directed not only at dishonor, but also at conduct that tempts dishonor." *Capital Gains*, 375 U.S. at 200. Accordingly, the Act "in recognition of the adviser's fiduciary relationship to his clients, requires that his advice be disinterested," and that "[t]o insure this it empowers the courts to require disclosure of material facts." *Id.* at 201.

> What is required is a picture not simply of the show window, but of the entire store[;] not simply truth in the statements volunteered, but disclosure. The high standards of business morality exacted by our laws regulating the securities industry do not permit an investment adviser to trade on the market effect of his own recommendations without fully and fairly revealing his personal interests in these recommendations to his clients.

*Ibid.* (internal quotations omitted).

It is plain that the disclosures made by Westport and McClure in the Forms ADV did not meet this demanding standard. Part 2A of Westport's Forms ADV warned clients that Westport and McClure *might* be deriving additional compensation from their trading activities on the clients' behalf. It did not advise the clients that they were *actually* doing so, much less how they were specifically doing so by reselling shares at higher prices purchased from syndicate offerings and by garnering 12b-1 fees from mutual fund transactions.

The D.C. Circuit has recently ruled that this type of vague disclosure is inadequate to satisfy the obligations of the Investment Advisers Act. In *Robare Group, Ltd. v. SEC*, 922 F.3d 468, 475-76 (D.C. Cir. 2019), the court explained that general disclosure in Forms ADV that the adviser "may" receive "selling compensation" was not adequate when the adviser failed to disclose that it had entered into an arrangement with Fidelity Investments under which it

"received payments from Fidelity for maintaining client investments in certain funds Fidelity offered," because "[t]his filing did not describe the payment arrangement with Fidelity much less alert [the adviser's] clients to the potential conflicts of interest it created." *See also Chasins v. Smith, Barney & Co.*, 438 F.2d 1167, 1172 (2d Cir. 1970) (Rule 10b-5 case; "failure to inform the customer fully of its possible conflict of interest, in that it was a market maker in the securities which it strongly recommended for purchase by him, was an omission of material fact"); *In re WorldCom, Inc. Sec. Litig.*, 294 F. Supp. 2d 392, 430-31 (S.D.N.Y. 2003) (Rule 10b-5 case; boilerplate disclosures to the effect that the firm "may" have contrary interests not sufficient).

The disclosures in the Forms ADV were internally contradictory as well. The vague warnings about possible conflicts stated in Part 2A were at odds with the responses in Item 8A(2) of Part 1 denying that Westport sold shares as a principal to its clients and in Part 2B that declined to acknowledge the receipt of fees from mutual fund transactions.

All in all, no reasonable jury could conclude that the disclosures adequately apprised Westport and McClure's clients of the manner and degree to which Westport and McClure had substantial incentives to engage in transactions that were not in the best interests of their clients. Westport and McClure's clients did not understand that their advisers had motives to engage in trades that could well *lose* money for them while still *gaining* money for Westport and McClure. To paraphrase Mel Brooks, the possibilities for extra revenue from syndicate sales and 12b-1 fees meant that Westport and McClure might make more money by buying securities that were a "flop" rather than a "hit." *See* THE PRODUCERS (Embassy Pictures 1967). This was a significant conflict of interest, one that Westport and McClure failed to adequately disclose to their advisory clients.

### 2. *Scienter*

Westport and McClure next argue that there is a genuine issue of fact as to scienter—whether they acted intentionally, knowingly, or recklessly as required to show a violation of section 206(1) of the Act. *See SEC v. Penn*, 225 F. Supp. 3d 225, 236-37 (S.D.N.Y. 2016). I agree. The SEC has not met its burden to show that there is no genuine fact issue as to even the lowest of these standards: recklessness.

For purposes of a claim under section 206(1), "[t]he kind of recklessness required . . . is not merely a heightened form of ordinary negligence; it is an extreme departure from the standards of ordinary care . . . which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *SEC v. Steadman*, 967 F.2d 636, 641-42 (D.C. Cir. 1992) (internal quotations omitted); *SEC v. Moran*, 922 F. Supp. 867, 897 (S.D.N.Y. 1996) (same).

The SEC does indeed point to substantial evidence of recklessness. Westport and McClure raked in hundreds of thousands of dollars from transactions they engaged in with their clients' advisory accounts without alerting their clients to a manifest conflict of interest. Still, "in ruling on a motion for summary judgment, the evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan*, 572 U.S. at 651 (cleaned up). In particular, "[t]he Second Circuit has been lenient in allowing scienter issues to withstand summary judgment based on fairly tenuous inferences." *Press v. Chem. Inv. Serv. Corp.*, 166 F.3d 529, 538 (2d Cir. 1999). Whether a given state of mind existed is generally a question reserved for the finder of fact. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 194 (2d Cir. 1998).

In light of this lenient standard, I conclude that Westport and McClure have adduced enough facts to create a jury question about whether they acted recklessly in violation of their clients' rights to be apprised of their conflict of interest. As to the compensation received from syndicate sales offerings, Westport and McClure point to the fact that the shares were in Westport's account for a very brief period of time and re-sold to their clients at the prevailing market price, Doc. #58-1 at 11, 41-42 (¶¶ 23, 73); these were technically "principal" trades only because principal trading was the best means of allowing Westport's advisory clients to profit from potentially-lucrative syndicated share offerings they could not access in their own right. McClure attests that he did not understand these transactions to constitute "principal" transactions of the type that was required to be disclosed because the advisory accounts were sold shares at the prevailing market rate rather than "upsold" shares at an above-market price. *Id.* at 31-34 (¶¶ 63-66).

To be sure, the SEC points to Westport's internal policies that prohibited principal transactions in general and to McClure's acknowledgement to an insurance company in 2013 that the firm engaged in revenue-enhancing principal transactions. *Id.* at 29, 33-34 (¶¶ 59, 65-66). But the evidence runs both ways, and it should be for a jury to decide if Westport and McClure acted recklessly in failing to disclose its conflict of interest from the syndicate offering transactions.

As to the compensation received from 12b-1 fees, Westport and McClure maintain that these fees accrued as a result of a finicky share-buying platform that did not give Westport a fee-free alternative to the Class A shares Westport bought, rendering some Class A purchases inadvertent, and others done because of a genuine belief that doing so was in the best interests of the client notwithstanding Westport's additional compensation. *Id.* at 13-16, 19-21 (¶¶ 29, 32,

36-38). Moreover, the relatively small amount of compensation (less than $100,000) that Westport and McClure derived over the course of several years from 12b-1 fees is additional grounds for Westport and McClure to argue that it was not altogether reckless for them to fail to disclose these fees. Fact issues remain for a jury to decide if Westport and McClure acted with a reckless state of mind in failing to disclose the conflict of interest from the 12b-1 fees it received.

To the extent that there remains a genuine issue of fact as to recklessness, it follows that there remain genuine issues of fact as to the higher-level standards of knowing or intentional fraud. Accordingly, I will deny the SEC's motion for summary judgment as to Count One.

### B. Count Two – Section 206(2)

Count Two alleges that Westport and McClure negligently failed to disclose their conflicts of interest, in violation of Section 206(2) of the Investment Advisers Act.[6] Much the same analysis applies to determining a section 206(2) violation as applies to analysis of a section 206(1) violation, except that the adviser need only be negligent, and not reckless or willful, about the failure to disclose. *See Robare Group*, 922 F.3d at 472; *Moran*, 922 F. Supp. at 897; *see also SEC v. DiBella*, 587 F.3d 553, 567 (2d Cir. 2009) (government "need not show intent to make out a section 206(2) violation").

As noted above, the parties do not dispute the transactions that occurred and that Westport and McClure had a conflict of interest that was required to be disclosed under the Act. Moreover, I have already concluded as discussed above that Westport and McClure's disclosures were not adequate as a matter of law. Accordingly, the only issue remaining is whether there is a

---

[6] Section 206(2) provides in relevant part that "[i]t shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly-- … (2) to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C. § 80b-6(2).

genuine dispute of material fact that Westport and McClure were at least negligent when they failed to make these disclosures.

Negligence is the failure to "exercise reasonable care under all the circumstances." *Robare Group*, 922 F.3d at 477 (applying negligence standard for section 206(2) claim). Notwithstanding Westport and McClure's argument to the contrary, the SEC need not adduce a standard of care through expert testimony because, "regardless of what Form ADV requires," the Investor Advisers Act itself imposes "a fiduciary duty to fully and fairly reveal conflicts of interest to [the adviser's] clients." *Id.* at 478. In certain cases, "the question whether [the investment advisory firm] and its principals negligently breach their duty [is] not so complex as to require expert testimony." *Id.* Indeed, in *Robare*, the D.C. Circuit held expert testimony was unnecessary when "for a decade [the firm's] disclosures simply did not refer to the payment arrangement with Fidelity, much less its terms."[7]

Even viewing the facts in the light most favorable to Westport and McClure, there is no genuine fact issue that they acted at least negligently when they failed to disclose the conflicts of interest they had in nearly 1,400 syndicate offering transactions generating an additional compensation of $650,000. It defies belief—not to mention the record—to suggest that Westport and McClure were not aware of these profits or should not have been aware as experienced investment professionals that these principal transactions were themselves required to be disclosed as principal transactions on the Form ADV—as well as creating a conflict of interest

---

[7] Westport relies on *SEC v. Ginder*, 752 F.3d 569 (2d Cir. 2014), but this case is inapposite, and in fact makes clear that "[t]he SEC rightly points out that the necessity of expert testimony depends on circumstances, and that there is no categorical rule requiring expert testimony in a securities case." *Id.* at 575. The SEC in *Ginder* failed to advance a theory that defendants were negligent, instead "succumb[ing] to its strategic choice at trial to pursue a theory of scienter or nothing." *Id*. at 576. Here, by contrast, the SEC proceeds on its negligence theory and has presented evidence—indeed, overwhelming evidence—of negligence.

that required far fuller disclosure than they provided. In light of the undisputed evidence of what Westport and McClure knew, no reasonable jury could conclude that Westport and McClure were not at least negligent in failing to disclose these conflicted principal transactions.

Westport and McClure blame their failure to disclose on their compliance consultant, Regulatory Compliance, LLC. But I am not persuaded that a reasonable jury could conclude that bad advice from the compliance consultant relieved Westport and McClure of its own negligent failure to advise clients of their conflict of interest as the law required. *See Robare*, 922 F.3d at 478 (reliance on compliance consultant advice was "objectively unreasonable" because the defendants "knew of their fiduciary duty to fully and fairly disclose the potential conflicts from the payment arrangement with Fidelity, yet repeatedly failed to disclose the source and details of the conflicts"). This is especially so in light of Westport's contract with the consultant, which emphatically disclaimed that the consultant would furnish legal advice. The contract—which was signed by McClure on Westport's behalf—stated that "Client acknowledges that Regulatory Compliance does not render any legal or financial advice relating to incorporation, *compliance with securities laws*, or any other advice of a legal or financial nature. *The Client should refer to legal or financial counsel for such advice*." Doc. #47-53 at 1 (emphasis added). The contract further provided that the consultant's "performance of its Services under this Agreement does not discharge Client, in any way, [of] its obligations under FINRA, SEC, State and/or any other regulatory agency's regulations." *Id.* at 2; *see also* Doc. #47-54, #47-55, #58-2 at 141-72 (similar contracts). The Scope of Work agreed to between Westport and the consultant similarly omitted legal advice from the list of services it provided. *See, e.g.*, Doc. #47-54 at 1; 47-54 at 8; 47-55 at 7; 47-55 at 10.

In light of Westport and McClure's decision to enter into a compliance consulting agreement that expressly disclaimed the receipt of legal advice about compliance with the securities laws, no reasonable jury could conclude that Westport and McClure could reasonably have relied on any advice from the consultant that excuses them from their negligent failure to disclose their conflict of interest arising from their syndicated offering transactions with their clients. Accordingly, I will grant the SEC's motion for summary judgment as to its Section 206(2) negligence claim against Westport and McClure with respect to the syndicated offering transactions.

For similar reasons, I will grant the SEC's motion for summary judgment as to its Section 206(2) negligence claim against Westport and McClure with respect to the 12b-1 fees. Although Westport and McClure have raised fact issues (as discussed above) about whether their trading platform allowed them to buy mutual fund shares without receiving the benefit of 12b-1 fees, the reality remains that they received these fees regardless, and they did so without disclosing to their clients that they were receiving fee payments. No reasonable jury could conclude that it was not at least negligent for Westport and McClure to fail to disclose their receipt of 12b-1 fees to their advisory clients.[8]

### C. Count Three – Section 206(3)

Count Three alleges that Westport engaged in principal transactions with its clients without disclosing the "principal" capacity in which Westport was acting and without also

---

[8] It is no answer to say that any of the underlying investment decisions (whether in securities from syndicated seller-dealer offerings or in mutual funds) were otherwise sound or profitable, because a violation of the Investment Advisers Act does not require a showing of any actual harm to the client, as distinct from a deprivation of a client's right to full and fair information about the presence and extent of the adviser's conflict of interest. *See Capital Gains*, 375 U.S. at 201.

(continued…)

obtaining the consent of the clients, in violation of Section 206(3) of the Investment Advisers Act.[9] "Unlike section 206(1) and (2) of the Act, section 206(3) can be violated without a showing of fraud." *SEC v. Nadel*, 97 F. Supp. 3d 117, 127 (E.D.N.Y. 2015); *accord SEC v. Ahmed*, 308 F. Supp. 3d 628, 655-56 (D. Conn. 2018).

As I have discussed above, Westport did not disclose in advance of its syndicated seller-dealer transactions that it was acting as the principal in these transactions. To the contrary, Westport flatly denied in its Forms ADV that it was acting as a principal to sell securities it owns to its advisory clients. Doc. #58-1 at 45 (¶ 80) (answering "no" to the query in Item 8A(2) of Part 1 of Form ADV, asking, "Do you or any related person . . . sell securities you own to advisory clients (principal transactions)?"). The strongest evidence that Westport adduces of its disclosure to clients of acting as a principal with respect to syndicated seller-dealer transactions is an ambiguous statement buried in the fine print of trade confirmations that were transmitted to the clients only *after* the transactions took place. Doc. #58-2 at 119-120 (sample trade confirmation).

Moreover, even assuming Westport disclosed the principal status of its syndicated seller-dealer transactions to its clients, there is not the slightest bit of evidence that Westport secured its clients' consent to any of these transactions. The most that Westport can do is say that its clients did not raise after-the-fact objections following Westport's trade confirmation disclosures. Westport cites no authority for its argument that a mere failure to object satisfies the affirmative consent requirement of section 206(3), and Westport's argument to the contrary borders on the

---

[9] Section 206(3) provides in relevant part that "[i]t shall be unlawful for any investment adviser by use of the mails or any means or instrumentality of interstate commerce, directly or indirectly-- … (3) acting as principal for his own account, knowingly to sell any security to or purchase any security from a client, or acting as broker for a person other than such client, knowingly to effect any sale or purchase of any security for the account of such client, without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction." 15 U.S.C. § 80b-6(3).

(continued…)

frivolous. I will grant the SEC's motion for summary judgment against Westport on Count Three.[10]

### D. Count Four – Aiding and Abetting Section 206(3) Violation

Count Four alleges that McClure aided and abetted Westport's violation of section 206(3). Section 209(f) of the Investment Advisers Act separately provides for aiding-and-abetting liability against anyone who "knowingly or recklessly" aids a violation of the Investment Advisers Act.[11]

For aiding-and-abetting liability as it generally arises in the securities context, the Second Circuit has outlined three elements: "the government must prove: (1) the existence of a securities law violation by the primary (as opposed to the aiding and abetting) party; (2) 'knowledge' of this violation on the part of the aider and abettor; and (3) 'substantial assistance' by the aider and abettor in the achievement of the primary violation." *DiBella*, 587 F.3d at 566. Consistent with the specific text of section 209(f), either knowledge or recklessness may suffice for purposes of aiding-and-abetting liability. *See SEC v. Landberg*, 836 F.Supp.2d 148, 157-58 (S.D.N.Y. 2011).

As I have already concluded above, the SEC has proved that Westport violated section 206(3), and I now conclude that the evidence is equally conclusive that McClure knew of this violation (or was at least reckless if he did not actually know of the violation). More than 1,000 of Westport's nearly 1,400 syndicated seller-dealer transactions involved McClure's own

---

[10] Because there is no evidence of *any* consent by clients to Westport's principal trades, I need not address the SEC's argument that section 206(3) requires transaction-specific consent rather than blanket consent. *See, e.g.*, *Nadel*, 97 F. Supp. 3d at 127-29 (rejecting blanket consent).

[11] Section 209(f) provides in full that "[f]or purposes of any action brought by the Commission under subsection (e), any person that knowingly or recklessly has aided, abetted, counseled, commanded, induced, or procured a violation of any provision of this subchapter, or of any rule, regulation, or order hereunder, shall be deemed to be in violation of such provision, rule, regulation, or order to the same extent as the person that committed such violation." 15 U.S.C. § 80b-9(f).

advisory clients. Doc. #58-1 at 4-5, 10 (¶¶ 9-10, 22). McClure admits that he personally reviewed the trading in Westport's trading accounts on a daily basis, and the daily trading logs showed that the seller-dealer offerings were being sold from Westport's own account as principal to advisory client accounts at a higher price than Westport had paid for them. *Id.* at 28-29 (¶ 57). McClure acknowledged as much to Westport's insurance company. *Id.* at 33 (¶ 65). Westport eventually gained about $650,000 in compensation from these principal transactions, of which the lion's share—$530,000—was attributable to clients McClure himself personally advised. *Id.* at 6 (¶ 12).

McClure doubtlessly knew that neither he nor anyone at Westport was informing clients in advance of Westport's position as a principal in these transactions. And he doubtlessly knew that neither he nor anyone at Westport ever obtained the clients' consent. Accordingly, because there is no genuine issue of fact as to McClure's aiding-and-abetting liability for Westport's violation of section 206(3) of the Investment Advisers Act, I will grant the SEC's motion for summary judgment against McClure on Count Four.

### E. Count Five – Section 207

Count Five alleges that Westport and McClure made untrue statements in its Forms ADV filed with the SEC, in violation of section 207 of the Investment Advisers Act.[12] The complaint alleges that the Forms ADV as filed by Westport and signed by McClure (1) falsely stated that Westport did not engage in principal transactions with advisory clients, and (2) failed to disclose

---

[12] Section 207 of the Act makes it "unlawful for any person willfully to make any untrue statement of a material fact in any registration application or report filed with the Commission under section 80b-3 or 80b-4 of this title, or willfully to omit to state in any such application or report any material fact which is required to be stated therein." 15 U.S.C. § 80b-7.

that Westport and its supervised persons accepted 12b-1 fees from the sale of mutual funds. Doc. #1 at 18 (¶ 72).

As discussed above, there is no dispute that Westport falsely answered "no" in Part 1 of the Forms ADV, when asked whether it engaged in principal transactions with its advisory clients. Doc. #58-1 at 45 (¶ 80). Nor is there any dispute, in light of the facts showing Westport's receipt of 12b-1 fees, that Westport made a false statement in Part 2B of the Forms ADV when it omitted disclosure of the receipt of "distribution or service ('trail') fees from the sale of mutual funds." Doc. #58-1 at 23 (¶ 44).

The remaining issue is whether these statements were "willfully" false as section 207 requires. I understand section 207's willfulness requirement to mean that the defendant "intentionally submitted [the application] knowing that the application contained material false information." *Mathis v. SEC*, 671 F.3d 210, 218 (2d Cir. 2012) (interpreting "willfully" in context of analogous false statement statutes, 15 U.S.C. § 78c(a)(39)(F) and § 78o(b)(4)(A)). If a defendant is proved to know that he was submitting a statement he knew at the time to be false, then it need not be further established that the defendant knew by doing so he was breaking the law. *Id.* at 217.

I conclude that genuine fact issues remain about whether the false statements in the Forms ADV were willfully made by Westport and McClure, for much the same reason as I concluded that genuine fact issues remained about Westport and McClure's scienter in my discussion of Count One. Willfulness requires an inquiry into the relevant actor's state of mind, and McClure has attested that he did not understand the syndicate seller-dealer transactions to constitute "principal" transactions of the type that was required to be disclosed on Part 1 of the Forms ADV. Doc. #58-1 at 31-34 (¶¶ 63-66). Similarly, the record does not conclusively show,

when viewed in light of Westport's alleged problems with the trading platform (*id.* at 13-16, 19-21 (¶¶ 29, 32, 36-38)), as well as the smaller amount of 12b-1 fees received, that the omissions of information about service fees from mutual funds from Part 2B of the Forms ADV were willful. Accordingly, I will deny the SEC's motion for summary judgment on Count Five.

## CONCLUSION

For the foregoing reasons, the SEC's Motion for Summary Judgment (Doc. #47) is GRANTED as to Counts Two, Three, and Four and DENIED as to Counts One and Five. The SEC's request to preclude any advice-of-consultant evidence or defense, as well as its request for the imposition of sanctions or penalties, are both DENIED without prejudice to renewal at trial. The parties shall file their Joint Trial Memorandum by **November 1, 2019**, and the Court shall thereafter set a date for a jury trial. It is so ordered.

Dated at New Haven this 30th day of September 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge