## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE
COMMISSION,
        *Plaintiff*,

        v.                                                    No. 3:17-cv-02064 (JAM)

WESTPORT CAPITAL MARKETS LLC *et
al.*,
        *Defendants*.

### ORDER DENYING DEFENDANTS' MOTION FOR JUDGMENT
### AS A MATTER OF LAW AND MOTION FOR A NEW TRIAL

The U.S. Securities and Exchange Commission filed this civil action against Westport

Capital Markets, LLC, and its owner and chief executive officer, Christopher E. McClure, for

failing to comply with their disclosure obligations under the Investment Advisers Act. The case

has proceeded through summary judgment and trial. I granted summary judgment in favor of the

SEC on three of its claims, and the jury at trial ruled for the SEC on the two remaining claims.

Westport and McClure now move for entry of judgment as a matter of law pursuant to

Fed. R. Civ. P. 50 and, in the alternative, for a new trial pursuant to Fed. R. Civ. P. 59. They

argue that the trial evidence was insufficient, that the jury verdict form was defective, that the

jury was not impartial, and that they were prejudiced by the onset of the COVID-19 pandemic

during trial. Because I conclude that there is no merit to any of these arguments, I will deny the

motions for judgment as a matter of law or for a new trial.

### BACKGROUND

Westport was a financial investment company that advised and invested funds on behalf

of a wide range of clients. McClure was Westport's owner, president, and chief compliance

officer. Westport was dually registered under the securities laws as both a broker-dealer and an

investment adviser.

Westport and McClure had many clients for whom they served as investment advisers. These advisory clients paid a quarterly fee in return for Westport and McClure's management of their accounts to buy and sell securities consistent with the clients' stated investment objectives and risk tolerance. When acting in an investment adviser capacity, Westport and McClure were subject to the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq*. This statute was enacted "to achieve a high standard of business ethics in the securities industry." *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 186 (1963). It imposes on investment advisers "an affirmative duty of utmost good faith, and full and fair disclosure of all material facts" about their services to their clients. *Id.* at 194 (citation omitted). In particular, investment advisers must tell their clients about "all conflicts of interest which might incline an investment adviser— consciously or unconsciously—to render advice which [is] not disinterested." *Id.* at 191-92.

The SEC alleged that Westport and McClure had a long-running conflict of interest that was neither adequately disclosed to their clients nor disclosed to the SEC as required. Specifically, the SEC alleged that Westport and McClure chose to invest their clients' funds in types of investments that garnered Westport and McClure hundreds of thousands of dollars in income that their clients did not know about.

This meant Westport and McClure had an undisclosed conflict of interest: they had an incentive to invest their clients' funds in the type of investments that generated extra income for Westport and McClure rather than in other investments that would otherwise be in their clients' best interests. As one of the SEC's trial experts explained it, "the whole point of being an investment adviser is that you're supposed to be providing impartial and objective trading advice," and "if a major part of your business and your profit and your cash flow is based on transactions in which you have an economic interest in transaction A versus transaction B, that

runs counter to the very purpose of why a client would want to have an investment adviser in the first place."[1]

There were two streams of income from third-party sources that the SEC alleged were not adequately disclosed to Westport clients. The first and largest was income from so-called "selling dealer" syndicate offerings. Westport would buy for its own account an allocation of initial public syndicated share offerings at a discount from the public offering price and then resell these securities to its advisory clients at the public offering price, earning as it did so a selling concession for the shares that were sold to the clients. Because these transactions involved the sale of shares to clients from Westport's own proprietary account, they were "principal" transactions within the meaning of the securities laws and subject to special disclosure and consent rules.

The second stream of income came from so-called "12b-1 fees," which were distribution fees that were paid to Westport by mutual funds in conjunction with certain mutual fund investments and which were ultimately charged by the mutual fund to the investor client. These 12b-1 fees are often avoidable: they are charged only for investments in certain share classes of a mutual fund, such that it may be possible to purchase a different share class of the same mutual fund that is not accompanied by 12b-1 fees.

The SEC filed a complaint including five counts. Doc. #1. Count One alleges that Westport and McClure intentionally, knowingly, or recklessly defrauded their clients, in violation of section 206(1) of the Investment Advisers Act, 15 U.S.C. § 80b-6(1). Count Two alleges that Westport and McClure negligently engaged in practices that operated as a fraud or deceit on their clients, in violation of section 206(2) of the Investment Advisers Act, 15 U.S.C. §

---

[1] Doc. #135 at 52 (Tr. 544) (testimony of Marti Murray).

80b-6(2). Count Three alleges that Westport sold its advisory clients securities that Westport owned without disclosing to those clients its "principal" status and without obtaining client consent for each transaction, in violation of section 206(3) of the Investment Advisers Act, 15 U.S.C. § 80b-6(3). Count Four alleges that McClure aided and abetted Westport in the conduct complained of in Count Three, in violation of section 209(f) of the Investment Advisers Act, 15 U.S.C. § 80b-9(f). Finally, Count Five alleges that Westport and McClure willfully made untrue statements in their filings with the SEC, in violation of section 207 of the Investment Advisers Act, 15 U.S.C. § 80b-7.

### A. Summary judgment ruling

The SEC moved for summary judgment on all five counts, and I granted the motion in part and denied it in part. *See SEC v. Westport Capital Markets LLC*, 408 F. Supp. 3d 93 (D. Conn. 2019). Because my summary judgment ruling is necessary to understand the limited scope of the issues that eventually went to trial, I will describe the summary judgment ruling in more detail.

I granted summary judgment as to Counts Two, Three, and Four of the complaint. As to Count Two (alleging that Westport and McClure had negligently engaged in a practice that operated as a fraud or deceit on its clients), I concluded in relevant part that there was no genuine issue of fact to show that Westport and McClure had failed to adequately disclose their conflict of interest to advisory clients and that they acted at least negligently in failing to do so. As I explained in my ruling, it was undisputed that Westport and McClure were afflicted with a conflict of interest as a result of their receipt of selling dealer concession fees and their receipt of mutual fund 12b-1 fees, and it was likewise undisputed that no one at Westport ever had a

conversation with any of their clients to explain that they were receiving this extra income in connection with the management of their accounts. *See Westport*, 408 F. Supp. 3d at 101.

Westport and McClure contended, however, that they had made adequate disclosure of their receipt of extra income by means of statements they made in regulatory forms known as "Forms ADV," which were periodically transmitted both to their clients and to the SEC. I did not agree. I concluded that the statements they made in the Forms ADV were too vague, conditional, and contradictory to suffice as a legally adequate disclosure of their receipt of the extra income and the conflict of interest that this engendered. *Id.* at 104-05 (discussing scope of statements made in Forms ADV and concluding that "no reasonable jury could conclude that the disclosures adequately apprised Westport and McClure's clients of the manner and degree to which Westport and McClure had substantial incentives to engage in transactions that were not in the best interests of their clients"); *see also id.* at 106 (reiterating as to Count Two that Westport and McClure's disclosures "were not adequate as a matter of law").

Having concluded that there was no genuine fact issue to show that Westport 's disclosures in its Forms ADV were legally adequate, I concluded that Westport and McClure—at a minimum—were negligent when they failed to make legally adequate disclosures. Notwithstanding Westport and McClure's argument that their compliance consultant—a company named Regulatory Compliance, LLC—was to blame for the statements made in the Forms ADV relating to selling dealer concession fees, I concluded that Westport and McClure were at least negligent under an objective reasonableness standard because Westport's contract with Regulatory Compliance—which was signed by McClure on Westport's behalf—disavowed the consultant's issuance of legal advice about compliance with the securities laws. *Id.* at 107-08.

I also concluded that Westport and McClure could not blame any misadvice from Regulatory Compliance for their failure to disclose their receipt of 12b-1 fees; despite Westport and McClure's claims that a finicky trading platform impeded them from purchasing the type of mutual fund shares that would not generate 12b-1 fees, Westport and McClure were aware all the same that they were receiving 12b-1 fees and they acted at least negligently in failing to disclose the receipt of these fees to their advisory clients. *Id.* at 108.

As to Count Three (alleging that Westport sold its advisory clients securities that Westport owned without disclosing to those clients its "principal" status and without obtaining client consent for each transaction), I granted the SEC's motion for summary judgment, noting that there was no dispute that Westport's sale to its clients from its own account of selling dealer shares constituted "principal" transactions and that "there is not the slightest bit of evidence that Westport secured its clients' *consent* to any of these [principal] transactions." *Id.* at 109 (emphasis added).

As to Count Four (alleging that McClure aided-and-abetted Westport's sale of securities to clients without disclosure of Westport's "principal" status and without obtaining client consent), I granted the SEC's motion for summary judgment. I detailed the overwhelming evidence of McClure's intensive and personal involvement in more than 1,000 of Westport's conflicted selling dealer transactions, describing how Westport "gained about $650,000 in compensation from these principal transactions, of which the lion's share—$530,000—was attributable to clients McClure himself personally advised." *Id.* at 109-10. In light of McClure's role as Westport's owner, president, and chief compliance officer, I concluded that "McClure doubtlessly knew that neither he nor anyone at Westport was informing clients in advance of Westport's position as a principal in these transactions," and that "he doubtlessly knew that

neither he nor anyone at Westport ever obtained the clients' consent" for Westport's participation as a principal in the selling dealer transactions. *Id.* at 110.

Having granted the SEC's motion for summary judgment as to Counts Two, Three, and Four, I otherwise denied the SEC's motion for summary judgment as to Counts One and Five of the complaint. For both counts, I concluded that genuine fact issues remained about whether Westport and McClure had acted with the heightened state of mind (*scienter*) that these counts required the SEC to prove.

Count One alleged that Westport and McClure acted intentionally, knowingly, or recklessly with respect to their failure to adequately disclose their conflict of interest from income that they received from selling dealer transactions and 12b-1 fees. I denied summary judgment on the ground that a genuine issue of fact remained about whether Westport and McClure's failures to disclose were the product of deliberate or reckless action as distinct from simple negligence. *Id.* at 105-06.

Count Five alleged that Westport and McClure willfully made false statements on forms filed with the SEC. On one of the forms, McClure, on behalf of Westport, falsely answered "no" when asked whether Westport engaged in principal transactions with advisory clients.[2] *Id*. at 110. On another of the forms, McClure, on behalf of Westport, failed to make a required disclosure that Westport earned 12b-1 fees from the sale of mutual funds.[3] Although it was undisputed that Westport's denial of engaging in principal transactions was false and that

---

[2] *See, e.g.,* Pl. Ex. #5 at 22 (Item #8 of the Form ADV filed on September 16, 2013, answering "no" to the question: "Do you or any *related person* . . . buy securities for yourself from advisory clients, or sell securities you own to advisory *clients* (principal transactions)?" (italics in original)).

[3] *See, e.g.,* Pl. Ex. #4 at 2-3 (Items 4 and 5 of Part 2B of the Form ADV not disclosing receipt of 12b-1 fees) and Pl. Ex. #144 at 178 (SEC instructions to Part 2B of the form ADV requiring disclosure of "distribution or service ('trail') fees from the sale of mutual funds."); *see also* Doc. #136 at 172-74 (Tr. 905-907) (McClure testimony).

Westport's Forms ADV did not refer to 12b-1 fees, I nonetheless concluded that a genuine fact issue remained whether Westport and McClure acted willfully when falsely denying principal transactions and omitting mention of 12b-1 fees. *Id.* at 110-11.

In light of my summary judgment ruling, the claims and issues for trial were significantly narrowed. The trial would proceed only as to Counts One and Five. And for both these counts, the only issues in dispute related to Westport and McClure's state of mind with respect to the failure to disclose conflicts of interest to clients (Count One) and with respect to the false statements and omissions in filings made with the SEC (Count Five).

### B. The trial evidence

I will start by summarizing the main body of the SEC's case which was focused on showing *scienter* by means of circumstantial evidence concerning McClure's dealings with some of his clients, his investment patterns, and the extent to which he and Westport profited from engaging in selling dealer transactions and from 12b-1 fees. Then I will describe evidence bearing on the various counterarguments and defenses raised by Westport and McClure at trial.

### 1. The SEC's case-in-chief

Much of the SEC's evidence included testimony from three of Westport's advisory clients (Henry Atterbury III, Amy Holzman, and Carolyn Pinchevsky) whose accounts were personally managed by McClure. These witnesses testified that they agreed at McClure's suggestion to convert their accounts from a broker-dealer arrangement to a discretionary advisory client arrangement and that McClure would manage their accounts conservatively.[4] In their many personal conversations with McClure, they each testified he never advised them that

---

[4] *See, e.g.,* Doc. #133 at 114-17, 120-22, 130-33 (Tr. 114-17, 120-22, 130-33) (Pinchevsky re Stein account); Doc. #133 at 211-15 (Tr. 211-15) (Holzman re Stein account); Doc. #135 at 103-110, 120-21, 143-145 (Tr. 595-602, 612-13, 635-637) (Atterbury re Atterbury account).

Westport was engaged in principal transactions with their accounts or otherwise earning any additional income from the way he managed their accounts in addition to the quarterly advisory fees they paid.[5] These witnesses also denied knowing from any of the boilerplate language in the Forms ADV that Westport would earn additional money from their accounts.[6] The SEC proved that McClure used these three accounts from 2012 to 2015 to earn more than $200,000 from selling dealer fees—an income gain that was nearly as much as Westport separately earned from the clients' payments in quarterly advisory fees during the same time period.[7]

Beyond these three clients, the SEC showed without contradiction that Westport and McClure invested dozens of their advisory clients in scores of selling dealer offerings involving principal transactions, generating more income that was not disclosed to the clients. According to the SEC's principal expert (Marti Murray), these selling dealer transactions in more than 150 different companies most often involved shares that had no credit rating at all or that were rated as "junk" or below-investment-grade quality; only 7.6% of these selling dealer offerings involved investment-grade securities.[8] Moreover, McClure often engaged in these transactions

---

[5] *See, e.g.,* Doc. #133 at 117-18, 120 (Tr. 117-18, 120) (Pinchevsky re Stein account); Doc. #133 at 216, 221, 225, 228-30, 232-33 (Tr. 216, 221, 225, 228-30, 232-33) (Holzman re Stein account); Doc. #134 at 22-25 (Tr. 275-278) (Holzman re Stein account); Doc. #135 at 101, 111-14, 154 (Tr. 593, 603-606, 646) (Atterbury re Atterbury account); *see also* Doc. #135 at 132-34 (McClure testimony stating he did not recall verbally telling any clients about income to Westport from selling dealer offerings).

[6] *See. e.g.*, Doc. #133 at 197-98 (Tr. 197-98) (Pinchevsky re Stein account).

[7] *See, e.g.*, Pl. Ex. 167d (showing $87,129 in selling dealer income compared to $131,483 in advisory fees for Estate of Sylvia Stein account from May 2013 through March 2015); Pl. Ex. 167e (showing $77,028 in selling dealer income compared to $81,756 in advisory fees for HC Atterbury account from June 2012 through June 2015); Pl. Ex. 167f (showing $57,554 in selling dealer income compared to $57,073 in advisory fees for Joan Atterbury account from June 2012 through June 2015).

[8] Pl. Ex. 168b; Doc. #135 at 59-61 (Tr. 551-53) (Murray testimony re Pl. Ex. 168b); *see also* Doc. #134 at 139, 185-86 (Tr. 392, 438-39) (testimony re prospectus for Fifth Street Senior Floating Rate Corp. noting that it was "junk" or "below-investment-grade" quality and "predominantly speculative" and that was purchased by McClure for the Atterbury account notwithstanding client investment objectives that did not include speculative investments). Defendants called an expert witness, Elliot Server, to offer opinion testimony that McClure's choice of investments (continued…)

within minutes of being advised of the availability of syndicated shares, suggesting that the decision was made to invest his clients in these offerings without adequate research and analysis of the quality of these investments.[9]

The SEC's evidence showed that from 2012 to 2015 Westport generated about $550,000 in net income from its sales of syndicated selling dealer shares to its advisory clients; this was income above and beyond the approximate $1.1 million that Westport charged these clients in advisory fees during the same time period.[10] More than 1,000 of these selling dealer transactions were engaged in for advisory clients under McClure's personal management.[11]

In addition, McClure personally received distributions of nearly $550,000 from 2012 to 2015 as a result of the income generated by Westport from its sale of selling dealer offering shares to its advisory clients.[12] All in all, as SEC expert Marti Murray testified, "the profit from the selling dealer offerings increased Westport's net income by 50 percent, increased Westport's cash flow from operations by 45 percent, and increased the distributions that Mr. McClure was able to take out of Westport by 45 percent."[13] And beyond all this income earned by Westport and McClure from selling dealer offerings, Westport earned more than $105,000 from 12b-1 fees charged to its advisory clients for their mutual fund investments.[14]

---

was reasonable in light of modern portfolio principles of diversification of investments and that the choice of investments in the Atterbury and Stein accounts was consistent with the clients' stated investment objectives. Doc. #136 at 205-35, 250 (Tr. 938-68, 983). Of course, it was for the jury and not me to decide which of the competing experts to credit.

[9] *See, e.g.,* Doc. #133 at 90 (Tr. 90) (12 minutes); Doc. #133 at 97-98 (Tr. 97-98) (4 minutes); Doc. #135 at 63-64 (Tr. 555-56) (noting "very short period of time" for investment decisions in selling dealer offerings).

[10] Pl. Ex. 168f; *see also* Doc. #135 at 57-58 (Tr. 549-50) (admitting and discussing this exhibit).

[11] Pl. Ex. 167a; *see also* Doc. #134 at 201-03 (Tr. 454-56) (admitting and discussing Pl. Ex. 167a).

[12] Pl. Ex. 168f; *see also* Doc. #135 at 57-58 (Tr. 549-50) (admitting and discussing this exhibit).

[13] Doc. #135 at 57-58 (Tr. 549-50) (Murray); Pl. Ex. 168f.

[14] Pl. Ex. 167m; *see also* Doc. #136 at 194 (Tr. 927) (McClure).

## 2. *The counterarguments and defenses*

Westport and McClure raised various defenses and arguments to counter the SEC's claims that they acted intentionally or recklessly in failing to disclose their conflict of interest to their clients (Count One) and that they acted willfully when they falsely stated on their Forms ADV that they did not engage in principal transactions and when they omitted disclosure of their receipt of 12b-1 fees (Count Five). Specifically, Westport and McClure raised the following arguments and lines of defense: (1) that they relied in good faith on mistaken advice from Regulatory Compliance; (2) that the limited disclosures they made in the Forms ADV suggested a lack of intent to mislead; (3) that they had an innocent misunderstanding about whether their selling dealer transactions constituted "principal" transactions that must be disclosed on their Forms ADV; and (4) that they faced technical obstacles impeding their ability to invest in mutual funds that did not generate 12b-1 fees. I will review the evidence relating to each of these arguments and defenses in turn.

### a. *Defense of reliance on compliance consultant*

Westport and McClure argued that they relied in good faith on advice and guidance from Regulatory Compliance. McClure testified that he spoke by telephone in 2011 to a compliance analyst at Regulatory Compliance named Ben Mascolo and that he "explained, A to Z, what we were contemplating" with respect to syndicate offerings.[15] Although McClure did little to elaborate on what he told Mascolo in this telephone conversation, McClure testified that Mascolo told him that "we could do" the syndicate transactions but "we had to put some language in our

---

[15] Doc. #135 at 212 (Tr. 704) (McClure).

ADV in order to do it."[16] Then, in a follow-up email exchange, Mascolo proposed the disclosure language that Westport ended up adopting for its Forms ADV.[17]

Mascolo was replaced by Lori Weston as Westport's account representative at Regulatory Compliance in 2012, and it was not until mid-2015 when Weston advised McClure that she believed that the selling dealer offerings constituted principal transactions that would have to be reported on the Forms ADV.[18] According to McClure, he was "shocked" by this news because it was contrary to what Regulatory Compliance had led him to believe since 2011.[19] McClure testified that this led in turn to Westport's consultation with counsel and self-disclosure by Westport of its conduct to regulatory authorities.[20]

The SEC disputed McClure's claim that he reasonably relied on any advice from Regulatory Compliance. On cross-examination by the SEC, McClure conceded that he had "no specific recollection of ever discussing with anyone at Regulatory Compliance that Westport's advisory clients were paying 12b-1 fees on their mutual fund holdings."[21] Thus, as an initial matter, it was undisputed that Westport and McClure's defense with respect to Regulatory Compliance was at most a *partial* defense: it related solely to Westport and McClure's conflicts of interest and false statements with respect to the selling dealer principal transactions and not to receipt of 12b-1 fees.

---

[16] *Id*. at 213 (Tr. 705).

[17] *Id.* at 214-15, 220-23 (Tr. 706-07, 712-715); Def. Exs. 509, 629a.

[18] Doc. #135 at 232-33 (Tr. 724-725); Doc. #136 at 112-14 (Tr. 845-47).

[19] Doc. #136 at 112 (Tr. 845).

[20] Doc. #136 at 115, 118 (Tr. 848, 851).

[21] Doc. #136 at 194-95 (Tr. 927-28).

The SEC's cross-examination of McClure also tried to show the limits of what McClure claimed to have told Regulatory Compliance with respect to the selling dealer transactions. McClure admitted that he never told Regulatory Compliance that he was "personally … making an additional $500,000 from buying selling dealer offerings in [his] advisory clients' accounts."[22] McClure also admitted that he did not memorialize in writing what he told Regulatory Compliance.[23] In addition, McClure admitted on cross-examination that Westport's follow-up email with Mascolo after McClure's telephone conversation with Mascolo did not disclose Westport's capacity as a principal as "part of a selling group" for the syndicate share offerings, referring only to "commission-based compensation" and without "telling [Mascolo] that Westport's getting paid as part of the selling price."[24]

The SEC also called Lori Weston to testify in its rebuttal case. Weston testified that she immediately flagged a concern about Westport's engaging in principal transactions when this was first disclosed to her by McClure in 2015 and that she was not otherwise privy to Westport's trading records or the amount of money that Westport was making from selling dealer transactions.[25] Weston also reviewed the terms of Regulatory Compliance's contract with Westport, which stated in relevant part that "Regulatory Compliance does not render any legal or financial advice relating to incorporation, compliance with securities laws, or any other advice of

---

[22] Doc. #136 at 195 (Tr. 928); *see also* Doc. #136 at 197 (Tr. 930) (McClure's agreement that he "didn't tell the people from whom [he] got investment advisory advice [at Regulatory Compliance] about the size or scope of [his] selling dealer offering practices").

[23] Doc. #136 at 201-02 (Tr. 934-35).

[24] Doc. #136 at 204 (Tr. 937) (testimony re Pl. Ex. 140).

[25] Doc. #137 at 24-26, 31-32, 37, 40 (Tr. 1030-1032, 1037-38, 1043, 1046).

a legal or financial nature," and that "[t]he client should refer to legal or financial counsel for

such advice."[26]

I instructed the jury with respect to Westport's claim of reliance on advice from

Regulatory Compliance.[27] I told the jury that "[g]ood faith on the part of a defendant is a defense

to the SEC's claims." Doc. #125 at 12. I then instructed the jury at length what it must consider

in deciding whether Westport's reliance on advice from Regulatory Compliance negated the

SEC's claims that Westport acted intentionally, recklessly, or willfully:

> You have heard evidence at trial about the defendants' relationship with a
> compliance consulting firm known as Regulatory Compliance, and you may
> consider these dealings when deciding whether the SEC has proven its claims.
> Merely the fact that the defendants consulted with Regulatory Compliance does
> not alone establish that they acted in good faith. Nor does the fact that they
> consulted with Regulatory Compliance establish good faith if they did not make
> full disclosure to Regulatory Compliance or if they did not follow the advice
> received from Regulatory Compliance. Thus, you may conclude that Westport
> and Mr. McClure relied in good faith on the advice of Regulatory Compliance
> only under the following circumstances:
>> (1)   That before they took the relevant action, Westport and Mr.
>>        McClure sought advice in good faith from Regulatory Compliance
>>        with the belief that Regulatory Compliance was a competent
>>        professional to furnish advice concerning the legality of their
>>        conduct,
>> (2)   That Westport and Mr. McClure made a complete disclosure to
>>        Regulatory Compliance of all the relevant facts known to them at
>>        the time,
>> (3)   That Westport and Mr. McClure received actual advice from
>>        Regulatory Compliance that their conduct complied with the law,
>>        and
>> (4)   That Westport and Mr. McClure followed the advice they were
>>        given by Regulatory Compliance in good faith.
> If these four factors are satisfied, you may consider Westport and Mr. McClure's
> reliance on Regulatory Compliance in determining whether they acted in good
> faith. But even if these four factors are satisfied, you do not need to necessarily
> conclude solely on this basis that they acted in good faith. Instead, you should
> consider all of the evidence before you before making your ultimate

---

[26] Doc. #137 at 39 (Tr. 1045) (quoting Pl. Ex. 152).

[27] Prior to trial I denied the SEC's motion to preclude Westport and McClure from defending on grounds of their reliance on a compliance consultant. *See SEC v. Westport Capital Markets LLC*, 2020 WL 948434 (D. Conn. 2020).

determination whether the SEC has proved that the defendants did not act in good faith.[28]

### b. Defense of partial disclosure on Forms ADV

Although I granted summary judgment against Westport and McClure on the issue of whether their statements in the Forms ADV adequately disclosed their receipt of income to satisfy the Investment Advisers Act, the disclosures that they made in the Forms ADV were nonetheless admitted at trial to allow Westport to argue that, to the extent Westport at least made limited disclosures in the Forms ADV, these limited disclosures weighed against a conclusion that Westport's failure to make an adequate disclosure was intentional or reckless. Thus, I instructed the jury that "there is no dispute for purposes of this trial that there was a conflict of interest and that any disclosures that Westport and McClure made to their clients about the conflict of interest were not legally adequate," but that "[a]lthough Westport and Mr. McClure did not make adequate disclosures, there is some evidence that they made statements to clients in the Forms ADV, and you may consider the nature and scope of any statements or disclosures that they did make in the Forms ADV when deciding whether their failure to make adequate disclosures was intentional or reckless." Doc. #125 at 9-10.

The Forms ADV sent to Westport's clients and the SEC between 2012 and 2015 contained the following language (or very similar language)—language that I found in my summary judgment ruling was too vague, conditional, and contradictory to discharge Westport and McClure's disclosure obligations:

> Where the firm is dually registered as an investment adviser and broker-dealer and licensed to sell various forms of insurance, firm personnel may receive additional commission-based compensation for their work on behalf of the firm. Sales of insurance, mutual funds, initial public offerings (to qualified clients), bonds, and other offerings may result in a commission and/or incentive/performance-based fee

---

[28] Doc. #125 at 12-14.

which is paid in addition to the advisory fee. Where the receipt of commission and fee-based compensation can create a conflict of interest, clients should note that they are under no obligation to pursue such investment offerings through Westport. The firm will not offer investments that give the sales opportunity more importance than that of a client's individual investment needs. However, clients should note that the receipt of commission and/or incentive-based compensation in addition to the advisory fee can create a conflict of interest. Questions regarding the firm's fees and/or its advisory/brokerage services may be addressed directly with the firm.[29]

Westport and McClure had a full opportunity at trial to argue to the jury that the fact that they made these disclosures in the Forms ADV was better than if they had made no disclosure at all and that the partial disclosures weighed against concluding that Westport and McClure acted intentionally or recklessly in derogation of their clients' rights and interests.

### c. *Defense as to false statements denying principal transactions*

Westport and McClure did not contest at trial that their selling dealer transactions with their clients constituted "principal" transactions for purposes of the Investment Advisers Act.[30] Nor did they contest that the answers that McClure provided on Forms ADV stating that Westport did not participate in principal transactions with its advisory clients were false. But both McClure and his chief assistant, Marissa Maher, testified that these answers were not *willfully* false because they did not understand at the time of these transactions from 2012 to

---

[29] Pl. Ex. 2 at 3 (admitted at Doc. #135 at 83 (Tr. 575)); *accord* Pl. Ex. 4 at 3 (admitted at Doc. #135 at 84 (Tr. 576)); Def. Ex. 545A at 3 (admitted at Doc. #133 at 154 (Tr. 154) and read into the trial transcript, *id*. at 162). In 2013, Westport used slightly different language in the above paragraph, which notably omitted the word "can" before "create a conflict of interest": "Receipt of both commission and fee-based compensation create a conflict of interest, as this practice gives the firm and its supervised persons an incentive to recommend products based on the compensation received, rather than on a client's needs. The firm and its supervised persons have a fiduciary obligation to act in the best interest of the firm's clients. Further, clients should note that they are under no obligation to pursue such investment offerings through Westport." Pl. Ex. 6 at 3 (reproduced at Doc. #47-34 at 3; admitted into evidence at Doc. #135 at 84 (Tr. 576)). *See also* Pl. Ex. 9 (admitted into evidence at Doc. #135 at 85 (Tr. 577)).

[30] As one of the SEC experts testified without contradiction, the selling dealer offerings were "principal trades" because "Westport purchased those seller dealing offerings into their proprietary trading account. … and then they were sold from Westport's account to the advisory clients." Doc. #135 at 51 (Tr. 543) (Murray).

2015 that they were principal transactions. In essence, they claimed that they thought that these transactions did not qualify as principal transactions because Westport sold the shares to their clients at the public offering price and did not mark up the price above what members of the public would otherwise pay.[31]

In response, the SEC introduced evidence to counter this claim that McClure or Westport did not understand at the time that these transactions were principal trades. The SEC called as a witness Eric Lawton who had worked as a broker with Westport from 2013 to 2018. He testified that while he was working there he invested some of his clients in selling dealer offerings and understood that they qualified as principal trades because they involved Westport's purchase of the securities for its own account that were then re-sold for a higher price to the client.[32] He testified that he spoke with McClure about the fact that these types of transactions were indeed principal trades.[33]

The SEC introduced additional evidence to cast doubt on the claims of McClure and Maher that they did not believe that the selling dealer transactions involved principal trades. The SEC pointed to how McClure's idiosyncratic understanding of the meaning of a principal trade was contrary to the simple definition of a "principal trade" in Westport's own compliance

---

[31] Doc. #134 at 157, 191 (Tr. 410, 444) (Maher testimony that because price difference was called a "concession" and "[w]e do not make the determination of the markup or markdown" the transaction was not a "principal transaction"); Doc. #135 at 165-67 (Tr. 657-59) (McClure testimony that he did not consider selling dealer transactions to be "principal trades" because the price was not marked up above the public price); Doc. #135 at 229-30 (Tr. 721-22) (McClure testimony that when he answered "No" on the SEC form that asked "Does your firm engage in principal transactions with clients?" "[w]e didn't believe that we were doing principal transactions at this point"); Doc. #136 at 86 (Tr. 819) (McClure testimony that these were not principal transactions because "[m]y definition of a principal transaction always has been you have the ability to affect the markup" and that "[t]hese new stock offerings did not give me that ability").

[32] Doc. #134 at 76-78 (Tr. 329-31).

[33] Doc. #134 at 81-84 (Tr. 334-37).

manual.[34] McClure's claimed understanding was also contrary to the fact that contemporaneous trading confirmation slips for the selling dealer transactions reflected that they were principal transactions.[35] His claimed misunderstanding was also contrary to the fact that Westport's agreement with the firm that channeled these selling-dealer offerings to them expressly described the transactions as "principal" transactions.[36] And his claimed misunderstanding was contrary to his own contemporaneous description of the selling dealer transactions when he was applying for an insurance policy in July 2013 and called them "principal" transactions.[37]

In addition, the SEC suggested that the claimed misunderstanding of the definition of a "principal transaction" was contrary to the plain language of the SEC form in which McClure falsely claimed that Westport did not engage in principal transactions. Under a heading for "Proprietary Interest in Client Transactions," McClure answered "No" to the following query: "Do you or any *related person*: … sell securities you own to advisory *clients* (principal transactions)?"[38] The SEC contended that the wording of this question left no doubt that the simple sale by Westport of securities from its own account to advisory clients constituted a principal transaction, without regard to whether the transaction entailed Westport charging its client a mark-up above the public offering price.

### d. Defense as to 12b-1 fees

---

[34] Doc. #135 at 54 (Tr. 546) (Murray).

[35] Doc. #134 at 154-59 (Tr. 407-12) (Maher testimony, referring to Def. Ex. 542 (admitted at Doc. #134 at 153 (Tr. 406))).

[36] Doc. #136 at 155 (Tr. 887) (McClure); Pl. Ex. 20.

[37] Doc. #134 at 169 (Tr. 422); Pl. Ex. #37 (statement by McClure in email of July 10, 2013, that Westport's income from "selling group participation" was "when we participate and get paid on a principal basis (the fee is part of the selling price).").

[38] Doc. #134 at 172-75 (Tr. 425-28) (Maher); Pl. Ex. 1 at 20 (Form ADV, Item 8) (Feb. 9, 2012) (italics in original).

As to the receipt of 12b-1 fees, Westport and McClure argued that the fees were unavoidable because they were beholden to a cumbersome trading platform that made it difficult for Westport to buy classes of mutual fund shares that would be exempt from 12b-1 fees. The SEC, however, countered this argument in various ways. First, Eric Lawton (who had worked with McClure as a broker at Westport) testified about how it was possible to invest client funds in share classes of mutual funds that did not generate 12b-1 fees, how it was an adviser's fiduciary duty of "best execution" to do so if it possible, and how he spoke with McClure about this issue.[39] Lawton acknowledged that the JP Morgan trading platform was cumbersome, but he testified that McClure told him it was possible to call the JP Morgan trading desk for assistance to make it possible to buy mutual fund shares not subject to 12b1-fees and that Lawton was successful in doing so.[40]

Moreover, the SEC's evidence showed that Westport transitioned in April 2015 to a different trading platform managed by another company (National Financial Services) that did not pose the same technical obstacles as the JP Morgan platform.[41] The SEC showed, however, that even after this transition, McClure admitted that he failed to transfer his clients' mutual funds that were generating 12b-1 fees to a class that would not generate 12b-1 fees and that he did not systemically transfer his clients' accounts away from non-12b-1 fee-paying shares until

---

[39] Doc. #134 at 43-45, 48-49, 73-75 (Tr. 296-98, 301-02, 326-28); *see also* Doc. #135 at 79-80 (Tr. 571-72) (Murray); Pl. Ex. 169 (¶ (e)) (joint stipulation of facts stating that "[m]any mutual funds offer an 'institutional share class' or an 'advisory share class' in which investors do not pay, and broker-dealers do not receive, a 12b-1 fee").

[40] Doc. #134 at 51-53, 70-72, 90-94 (Tr. 304-06, 323-25, 343-347).

[41] Doc. #134 at 94-95 (Tr. 347-48) (Lawton); Doc. #136 at 109-11 (Tr. 842-44) (McClure); Pl. Ex. 169 (¶¶ (f)-(i)) (joint stipulation of facts explaining how Westport had ready access after April 2015 to classes of mutual funds that did not assess 12b-1 fees and also how "Westport had the capability to exclude assets held in its clients' advisory accounts from the calculation of the advisory fee").

more than two years later in October 2017 at the brink of the onset of this litigation.[42] All in all, nearly half of the 12b-1 fees that were earned by Westport occurred after Westport had switched to a trading platform that Westport conceded posed no obstacles to the investment in share classes of mutual funds not subject to 12b-1 fees.[43]

### C.    *The jury verdict*

The jury ruled across-the-board in favor of the SEC and against Westport and McClure. The jury instructions reviewed each of the elements of Counts One and Five but told the jury that only those elements bearing on the issue of *scienter* were in dispute. With respect to those disputed elements, the jury concluded as to Count One that both Westport and McClure intentionally or recklessly failed to make the required disclosure of compensation from selling dealer offerings and compensation from 12b-1 fees.[44] Similarly, the jury concluded as to Count Five that when Westport and McClure "answered 'no' in Part I of the Forms ADV to a question whether Westport engaged in principal transactions with its advisory clients, [they] did so knowing that the answer was untrue."[45] And the jury concluded as to Count Five that when Westport and McClure "failed to disclose the receipt of 12b-1 fees from the sale of mutual funds on its Forms ADV, [they] did so knowing that [they were] omitting information that was required to be disclosed."[46]

---

[42] Doc. #136 at 186, 189-91 (Tr. 919, 922-24).

[43] *See* Pl. Ex. 167m (showing that more than 90 percent of the 12b-1 fees Westport earned were attributable to the purchase of mutual funds that had alternative non-12b-1 fee-charging share classes and that about 40 percent of the 12b-1 fees earned by Westport accrued after Westport's conversion to the National Financial Services platform); *see also* Doc. #134 at 232-33 (Tr. 485-86) (testimony of SEC expert Jan Jindra re this exhibit).

[44] Doc. #121-1 at 1-2.

[45] *Id*. at 2-3.

[46] *Id.* at 3.

## DISCUSSION

Westport and McClure move for judgment as a matter of law under Fed. R. Civ. P. 50 and alternatively for a new trial under Fed. R. Civ. P. 59. Doc. #143. Under Rule 50, a motion for judgment as a matter of law may be granted only if "a reasonable jury [did] not have a legally sufficient evidentiary basis to find for the party" that prevailed at trial. Fed. R. Civ. P. 50(a)(1). A party seeking judgment on this basis bears a "heavy burden," and will succeed only if "the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable [persons] could have reached." *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 52 (2d Cir. 2014) (internal quotations omitted). I must "consider the evidence in the light most favorable to the party against whom the motion was made and ... give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence." *Jones v. Treubig*, 963 F.3d 214, 224 (2d Cir. 2020) (internal quotations omitted). Moreover, "[t]he court cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury, and must disregard all evidence favorable to the moving party that the jury is not required to believe." *ING Glob. v. United Parcel Serv. Oasis Supply Corp.*, 757 F.3d 92, 97 (2d Cir. 2014) (internal quotations omitted).[47]

Rule 59(a) of the Federal Rules of Civil Procedure more broadly allows a court to grant a new trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). When evaluating a Rule 59 motion for new trial, a judge "may weigh the evidence and the credibility of witnesses and need not view the evidence

---

[47] In light of my conclusion that defendants have not met the ordinary standard for the grant of a Rule 50 motion, I need not address the SEC's argument (Doc. #145 at 2-3) that a more demanding standard should apply in light of the failure of Westport and McClure to renew their Rule 50 motion at the close of the defense case.

in the light most favorable to the verdict winner." *Raedle v. Credit Agricole Indosuez*, 670 F.3d

411, 418 (2d Cir. 2012) (citation omitted). Still, the Second Circuit has emphasized that "trial

judges must exercise their ability to weigh credibility with caution and great restraint, as a judge

should rarely disturb a jury's evaluation of a witness's credibility, and may not freely substitute

his or her assessment of the credibility of witnesses for that of the jury simply because the judge

disagrees with the jury." *Ibid.* (internal quotations and citations omitted). "A trial court should

not grant a motion for a new trial unless it is convinced that the jury ... reached a seriously

erroneous result or that the verdict is a miscarriage of justice." *Ali v. Kipp*, 891 F.3d 59, 64 (2d

Cir. 2018) (internal quotations omitted).

Westport and McClure seek judgment as a matter of law or a new trial on four grounds:

(1) that "there was insufficient evidence upon which a reasonable jury could conclude that

Defendants acted with scienter or made willfully false statements"; (2) that "the design of the

jury verdict form—reflecting the Court's prior determination on the prior majority of the

elements of each of the two sections charged—was prejudicial because it suggested to the jury

that the case was largely decided"; (3) that "a letter written to the SEC following the trial by

'Juror Number Five' displayed the jury's clear bias against Defendants which adversely affected

the jury's deliberation and, on its face, reveals a miscarriage of justice"; and (4) that "the

outbreak of a global pandemic, the news of which was unfolding rapidly during the course of the

trial and which resulted in the partial closing of the courthouse during jury deliberations,

deprived Defendants of their right to a fair trial." Doc. #143-1 at 2. I will address each argument

in turn.

   *A.   Sufficiency of evidence of* scienter

Westport and McClure argue that the evidence of *scienter* was insufficient in light of their reliance in good faith on Regulatory Compliance, the scope of the disclosures they made on the Forms ADV, and their prompt self-disclosure to regulatory authorities in mid-2015 after Lori Weston at Regulatory Compliance alerted McClure that Westport was engaged in principal transactions that must be reported to the SEC. Doc. #143-1 at 15-16.[48] But viewing the evidence as I must in the light most favorable to the SEC, I conclude that the evidence was easily sufficient for a jury to conclude that both Westport and McClure acted intentionally or recklessly in failing to adequately disclose their conflicts of interest to their clients and that they acted willfully in falsely claiming to the SEC that they did not engage in principal transactions and in failing to disclose to the SEC their receipt of 12b-1 fees.

The evidence showed that Westport and McClure pervasively engaged in conflicted selling dealer and 12b-1 fee transactions for several years and that they earned hundreds of thousands of dollars from doing so. These undisclosed earnings amounted to about 50 percent of what they otherwise earned from their clients' payment of advisory fees. A reasonable jury could have concluded that this large of a financial gain did not happen by accident—and that the size of the gain was a powerful motive for Westport and McClure to intentionally or recklessly keep their clients and the SEC in the dark about how they were earning this money. Moreover, in light of the evidence that McClure was under instructions from clients Atterbury, Holzman, and

---

[48] To the extent that Westport and McClure appear to dispute the issue and element of the adequacy of their disclosures to clients and the SEC, I decided this issue and element against them at the summary judgment stage of this litigation, and it was not submitted as an open issue for resolution by the trial jury. In any event, the trial evidence confirmed my summary judgment conclusion that there was no genuine fact issue to show that Westport and McClure's statements in their Forms ADV were legally adequate to advise their clients of the conflict of interest. I have already denied Westport and McClure's motion to reconsider my ruling on summary judgment, Doc. #102, and—in the absence of any intervening change in law or facts—their post-trial Rule 50 and Rule 59 motions are not appropriate vehicles for them to seek to relitigate issues long decided against them at the summary judgment stage of this action.

Pinchevsky to invest their money conservatively, the jury could well have concluded that the decision of Westport and McClure to invest a large proportion of these clients' accounts in mostly speculative and unrated selling dealer offerings reflected Westport and McClure's intentional or reckless decision to place their personal and undisclosed pecuniary interests above their clients' stated investment preferences.

As for Westport and McClure's claim of reliance on Regulatory Compliance, there was plenty of evidence for the jury to have concluded that they did not rely in good faith—if they indeed relied at all. For the most part, Westport and McClure's post-argument motions simply repeat the arguments that they made to the jury about Regulatory Compliance and that the jury plainly did not find persuasive. The jury's conclusion is hardly surprising in view of the threadbare corroboration that McClure offered for his claim that he fully disclosed ("A to Z") his selling dealer activities to Regulatory Compliance, as well as in view of his contract with Regulatory Compliance that expressly disavowed the consultant's issuance of legal advice about compliance with the securities laws.

As to the jury's findings with respect to the 12b-1 fees, there was no evidence at all that Westport or McClure told Regulatory Compliance about this stream of undisclosed income or sought advice from Regulatory Compliance about disclosure of 12b-1 fees. Because Westport and McClure could not plausibly blame their misconduct with respect to 12b-1 fees on Regulatory Compliance, this was all the more reason for the jury to doubt the rest of their reliance-on-compliance-consultant defense.

Nor was there any miscarriage of justice with respect to the jury's conclusion that Westport and McClure acted willfully when they falsely claimed on their Forms ADV that they did not engage in principal transactions with their advisory clients. Despite the claims of

McClure and Maher that they misunderstood at the time what constitutes a principal transaction, a reasonable jury could have credited the many reasons described above to doubt this claimed misunderstanding. The evidence was sufficient for a reasonable jury to conclude that both Westport and McClure not only knew what constitutes a reportable principal transaction but also that they willfully lied to the SEC so that they could continue to engage in these immensely profitable transactions without having to worry about seeking their clients' informed consent or alerting the SEC about their conflict of interest.

Because the evidence was sufficient for the jury to rule in the SEC's favor on all disputed issues of *scienter*, I will not grant the Rule 50 motion for judgment as a matter of law. In addition, in light of the SEC's highly convincing evidentiary showing in its case-in-chief and in response to the arguments raised by Westport and McClure, I conclude there was no miscarriage of justice to allow for the grant of the Rule 59 motion for a new trial.

### B.  Design of jury verdict form

Westport and McClure complain that the jury verdict form "was pre-marked with checkmarks indicating that all but one issue had already been decided against Defendants." Doc. #143-1 at 24. But Westport and McClure never objected to the jury verdict form on this ground or to the jury instructions which explained that, because certain elements were not disputed for purposes of trial, the verdict form was already pre-checked as to those elements. Doc. #137 at 74 (Tr. 1080). Westport and McClure advised the Court and the SEC that they had no objections to the verdict form. Doc. #145 at 19. Accordingly, I conclude that Westport and McClure have waived any such objection. *Cf. Smith v. Lightning Bolt Prods., Inc.*, 861 F.2d 363, 370-71 (2d Cir. 1988) (parties have "no standing" to object on appeal to special verdict questions to which they did not object at trial).

Nor do Westport and McClure show that they were prejudiced by the design of the jury verdict form. Except for the issue of the legal adequacy of their disclosures (which was conclusively decided against them at the summary judgment stage of this action), they do not say that they wished to dispute (or that there were any non-frivolous grounds to dispute) any of the other elements at issue. Instead, they claim without more that "[h]ad the form been configured differently, it may well have produced a different result." Doc. #143-1 at 24. Because Westport and McClure waived their objection and have not made any showing of prejudice, I reject their claim that the design of the jury verdict form warrants a grant of judgment in their favor or a new trial.

### C. Juror misconduct

Westport and McClure seek a new trial on the ground of juror misconduct. This claim rests on a congratulatory and gossipy handwritten letter that one of the jurors sent to one of the SEC's trial attorneys about a week after the jury returned its verdict. The letter (Doc. #138) reads as follows:

March 24, 2020

Dear Attorney Shields,

I just wanted to send a quick note of thanks and congratulations. Thanks for your public service as an SEC lawyer and congratulations on winning the SEC v. McClure and Westport Capital.

I was juror #5. The case was fascinating in many ways. From the very beginning of jury selection to the very end and "guilty!"

I loved watching you and atty Moran craft your case and build your evidence. Fascinating. Your expert witnesses (Murray + Jindra) were riv[e]ting. The Defense didn't have a chance.

I'm following the case on the SEC website for the final sentence.

Here's an aside you might find interesting. During our deliberations we spoke of many things and McClure's wife came up. She looked like she should have been at the Country Club playing Bridge. Her appearance came up and one of the jurors (who was a store manager at Macy's in West Hfrd) asked if anyone noticed her shoes—I did! The manager told us they cost $3000 a pair. Ouch! You might pass that on to defense attorneys you know.

All my best to you and attorney Moran in the future.

Sincerely,

Juror #5

P.S. I happened to watch Ms. McClure['s] face when the GUILTY verdict was read—I'll never forget! She was gutted and horrified. Her soul imploded. It was her husband['s] fault without a doubt.

According to Westport and McClure, "[t]he contents of the letter demonstrate that Juror #5 concealed his strong bias for the government, that the jurors discussed extraneous and inappropriate matters while deliberating and that Defendants were prejudiced by the jury's consideration of Mr. McClure's perceived wealth and lifestyle." Doc. #143-1 at 25. They argue that Juror #5's "apparent reverence for the United States government raises serious doubts about the truthfulness of his oath to this Court and to the litigants that he would be a fair and impartial juror," and contradicts the juror's answer of "Yes" to my question during *voir dire* whether he would be "fair and impartial if we asked you to serve?" *Id.* at 26; *see also* Doc. #142 at 114. They further argue that the letter demonstrates Juror #5's disregard of my final jury instructions stating that "all litigants are equal before the law" and that jurors should not "consider any personal feelings you may have about … wealth, lifestyle, or other features of the parties." Doc. #143-1 at 27 (quoting jury instructions).[49]

---

[49] Westport and McClure complain that the letter's reference to them being "guilty" and to awaiting a "sentence" suggests that there is a "serious question whether the jurors understood that this matter was a civil action and not a criminal one." Doc. #143-1 at 27 n.21. The jury instructions, however, explained that this case was not a criminal case and was subject to the burden and standards of proof of a civil case. Doc. #125 at 5. Moreover, Westport and (continued…)

A party may obtain a new trial if they show "that a juror failed to answer honestly a material question on *voir dire*, and then further show that a correct response would have provided a valid basis for a challenge for cause." *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548, 556 (1984). But Rule 606(b) of the Federal Rules of Evidence strictly limits the scope of evidence that may be used to prove such dishonesty. The rule provides that for purposes of "an inquiry into the validity of a verdict or indictment," a juror may not testify "about any statement made or incident that occurred during the jury's deliberations," or "the effect of anything on that juror's or another juror's vote," or "any juror's mental processes concerning the verdict or indictment," subject to certain exceptions including if "extraneous prejudicial information was improperly brought to the jury's attention." The rule further states that "[t]he court may not receive a juror's affidavit or evidence of a juror's statement on these matters."[50]

The limitations of Rule 606(b) have implications for a court's duty to conduct an inquiry when confronted with a claim of juror misconduct. As the Second Circuit has made clear, if the

---

McClure's own briefing conflates this case with a criminal case, insisting that their jury trial rights arise under the *Sixth* Amendment rather than the *Seventh* Amendment to the U.S. Constitution. *See* Doc. #143-1 at 25; Doc. #149 at 8-9.

[50] Rule 606(b) states in full:

**(b) During an Inquiry Into the Validity of a Verdict or Indictment.**

**(1) Prohibited Testimony or Other Evidence.** During an inquiry into the validity of a verdict or indictment, a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict or indictment. The court may not receive a juror's affidavit or evidence of a juror's statement on these matters.

**(2) Exceptions.** A juror may testify about whether:

**(A)** extraneous prejudicial information was improperly brought to the jury's attention;

**(B)** an outside influence was improperly brought to bear on any juror; or

**(C)** a mistake was made in entering the verdict on the verdict form.

limits imposed by Rule 606(b) render inadmissible the only known evidence of juror misconduct, then any further inquiry into the validity of the jury's verdict is "render[ed] . . . futile from the start." *United States v. Baker*, 899 F.3d 123, 132 (2d Cir. 2018) (collecting cases); *see also United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989) ("[w]e are always reluctant to haul jurors in after they have reached a verdict" to probe alleged juror misconduct absent "clear, strong, substantial and incontrovertible evidence ... that a specific, non-speculative impropriety has occurred") (internal quotation omitted).

As an initial matter, I do not agree that Juror #5's letter shows that Juror #5 was dishonest when he stated during *voir dire* that he could be fair and impartial. So far as the letter reflects, Juror #5 was very impressed with the strength of the SEC's case as it was presented at trial. The letter states nothing to suggest that Juror #5 harbored a pre-existing bias in favor of the SEC or the United States government in general. Nor does it suggest that he had decided from the outset to rule against Westport and McClure because of their wealth. The fact that a juror may find one party's witnesses and evidence to be very persuasive at trial is not indicative that the juror was biased from the outset in favor of that party.

In any event, the Supreme Court has interpreted Rule 606(b) to preclude the type of challenge that Westport and McClure make here. In *Warger v. Shauers*, a traffic accident plaintiff who lost at trial sought to invalidate the verdict by means of introducing a post-trial affidavit from one of the trial jurors that related statements by another juror during jury deliberations suggesting that the other juror was biased against awarding damages for traffic accidents. 574 U.S. 40, 43 (2014). The plaintiff argued that this juror's statement meant that the juror "had deliberately lied during *voir dire* about her impartiality and ability to award damages." *Ibid.* The Supreme Court rejected the challenge, holding that "Rule 606(b) applies to juror

testimony during a proceeding in which a party seeks to secure a new trial on the ground that a

juror lied during *voir dire*." *Id.* at 44.

The juror's letter here is a paradigmatic example of evidence barred by Rule 606(b).

First, the letter discusses the juror's admiration of the SEC's lawyering and the quality of their

experts. This falls within Rule 606(b)'s preclusive scope which bars juror testimony about "the

effect of anything on that juror's or another juror's vote," as well as the "juror's mental processes

concerning the verdict or indictment." Fed. R. Evid. 606(b). Next, the letter describes how

"[d]uring our deliberations we spoke of many things and McClure's wife came up," before

reciting the interchange among jurors about her expensive shoes. Doc. #138. Thus, the letter

makes clear that the jury's alleged conversation about McClure's wife and her shoes occurred

during jury deliberations, which again places this evidence well within the scope of Rule

606(b)'s bar on testimony about "any statement made or incident that occurred during the jury's

deliberations." Fed. R. Evid. 606(b).

Because the juror's complete statement as recited in the letter comes within the subject

matter scope of the rule, the letter falls within Rule 606(b)'s command that a "court may not

receive a juror's affidavit *or evidence of a juror's statement* on these matters." *Ibid.* (emphasis

added); *see also United States v. Cuthel*, 903 F.2d 1381, 1382-85 (11th Cir. 1990) (applying Rule

606(b) to bar consideration of juror's congratulatory letter to prosecutor stating how effectively

prosecutors presented the case and complimenting "the suits & ties you wore & those Argyle

socks too").[51]

---

[51] Although Westport and McClure rely on *United States v. Parse*, 789 F.3d 83 (2d Cir. 2015), that decision does not cite or discuss Rule 606(b). Moreover, the facts of that decision are distinguishable because it turned not only on a juror letter to the prevailing attorney but also additional non-juror-statement evidence amply proving that the juror had lied about her background during *voir dire*. *See id.* at 91 (describing how the juror's letter "prompted" an investigation of the juror's background and leading to discovery "of her disciplinary proceedings and her status as a (continued…)

Westport and McClure invoke the exception to Rule 606(b) for "extraneous prejudicial information [that] was improperly brought to the jury's attention." Fed. R. Evid. 606(b). But most of the letter relates Juror #5's impressions of the evidence he saw presented in the courtroom at trial. In no sense was the physical appearance of McClure's wife "extraneous" in view of her personal presence at trial and McClure's choice to highlight her presence when he testified.[52]

Nor was the alleged $3000 price tag for McClure's wife's shoes a piece of extraneous prejudicial information. As the Supreme Court explained in *Warger*, "information is deemed 'extraneous' if it derives from a source 'external' to the jury," and "'[e]xternal' matters include publicity and information related specifically to the case the jurors are meant to decide, while 'internal' matters include the general body of experiences that jurors are understood to bring with them to the jury room." 574 U.S. at 51. Whether jurors believed the shoes to be Priceline or Prada, their beliefs about the value of the shoes stemmed from the "internal . . . general body of experiences" of one or more jurors, experiences that fall outside the exception in Rule 606(b) for extraneous prejudicial information.

In short, notwithstanding that Juror #5's comments about McClure and his wife were tasteless and mean-spirited, I conclude that the juror's letter does not furnish any appropriate grounds for me to conduct a hearing or further inquiry to question the validity of the jury's verdict. Accordingly, I will decline to grant a new trial or hearing on the basis of juror misconduct.

### D.  Effect of COVID-19 pandemic on trial

---

suspended lawyer by searching public records"). Here, by contrast, the only evidence of alleged juror misconduct is the juror's letter itself recounting the juror's mental impressions and statements during deliberations.

[52] Doc. #135 at 163 (Tr. 655).

The jury concluded its deliberations in this case at a time when the COVID-19 pandemic was rapidly increasing in prominence and starting to lead to widespread social distancing efforts. Still, the federal court in New Haven remained open to the public subject to screening requirements through the end of the trial, and there were no jurors who requested to be excused from jury service because of the pandemic or any indication in the record that the jurors rushed their verdict. Westport and McClure never moved for a mistrial, and even now their argument about the effect of the pandemic on the jury's verdict is half-hearted: "while Defendants do not contend now that the arrival of the Coronavirus alone entitles them to a new trial, they do vigorously maintain that a verdict unsupported by substantial evidence and infected by juror bias as discussed above is subject to additional scrutiny because of the circumstances in which it was derived." Doc. #143-1 at 29. I conclude that the COVID-19 pandemic, whether alone or in combination with any other factors at issue in this case, does not warrant the grant of a new trial.

## CONCLUSION

For the foregoing reasons, the Court DENIES defendants' motion for judgment as a matter of law pursuant to Fed. R. Civ. P. 50 or in the alternative their motion for a new trial pursuant to Fed. R. Civ. P. 59. It is so ordered.

Dated at New Haven this 26th day of October 2020.

/s/ *Jeffrey Alker Meyer*_____
Jeffrey Alker Meyer
United States District Judge