UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, : <br> : <br> Plaintiff, : <br> : <br> v. : <br> : <br> WESTPORT CAPITAL MARKETS, LLC and : <br> CHRISTOPHER E. MCCLURE, : <br> : <br> Defendants. : <br> : | Civil No. 3:17-cv-02064(JAM) <br><br> Oral Argument Requested <br><br> January 11, 2021 |

**OPPOSITION TO PLAINTIFF SECURITES AND EXCHANGE COMMISSION'S MOTION FOR THE ENTRY OF FINAL JUDGMENT**

Westport Capital Markets, LLC ("Westport") and Christopher E. McClure ("Mr. McClure") (collectively, "Defendants"), by and through their undersigned counsel, hereby oppose Plaintiff Securities and Exchange Commission's ("SEC" or "Commission") motion for entry of final judgments.  Dkt. No. 152.

## I. PROCEDURAL STATEMENT OF THE CASE

The SEC filed its complaint against Defendants on December 11, 2017.  Dkt. No. 1. Defendants answered the complaint on February 7, 2017.  Dkt. No. 11.  The SEC filed a motion for summary judgment on February 15, 2019.  Dkt. No. 47.  Defendants filed a motion to dismiss the complaint's request for disgorgement, as well as a motion for partial summary judgment on February 15, 2019.  Dkt. Nos. 48 and 49.  On February 28, 2019, Defendants filed a motion to withdraw their motion for partial summary judgment, which the Court granted on March 1, 2019. Dkt. Nos. 52 and 53.

On September 30, 2019, the Court denied Defendant's motion to dismiss, without prejudice to renew during any remedial time of the litigation, and partially granted the SEC's

motion for summary judgment as to counts two, three, and four of the complaint. Dkt. Nos. 68 and 69. On October 7, 2019, Defendants filed a motion for reconsideration on the Court's order granting the SEC partial summary judgment. Dkt. No. 72. The Court denied Defendants' motion for reconsideration on February 14, 2020. Dkt. No. 102.

The jury trial began on March 9, 2020 and concluded on March 16, 2020. Dkt. Nos. 112-121. The jury rendered a verdict in favor of the SEC on counts one and five of the complaint. Dkt. No. 121. On April 27, 2020, Defendants filed a motion for judgment as a matter of law and a motion for a new trial. Dkt. No. 143. On October 26, 2020, the Court denied Defendants' motions. Dkt. No. 151. On November 11, 2020, the SEC filed a motion for the entry of a final judgment requesting, *inter alia*, permanent injunctions, disgorgement, and civil penalties. Dkt. No. 152.

Regarding the issue of injunctions, the SEC requests the Court to "permanently enjoin Westport and McClure from violating the relevant provisions of the Advisers Act." SEC Memorandum at 8. In addition, the SEC asks the Court to "enter a conduct-based injunction specifically addressing defendants' failure to disclose conflicts of interest, by requiring defendants to make transaction-specific disclosure (*i.e.*, beyond the disclosures in annual or periodic Forms ADV) to advisory clients whenever defendants stand to receive additional compensation." *Id*.

As to disgorgement, the SEC seeks an award of $820,761, reflecting both disgorgement and prejudgment interest, and that Westport and McClure be jointly and severally liable for this amount. *Id*. at 18.

As to civil monetary penalties, the SEC requests the Court "order Westport and McClure to pay second-tier penalties in the amount of $375,000 for Westport and $75,000 for McClure,

for defrauding clients by collecting inadequately-disclosed 12b-1 fee revenue.  In addition, the Commission requests that the Court order Westport and McClure, respectively, to pay third-tier penalties in the amount of $725,000 for Westport and $150,000 for McClure, for defrauding clients by collecting inadequately-disclosed selling-dealer revenue where clients were exposed to speculative investments and suffered substantial losses." *Id*. at 21.

## II. ARGUMENT

### A. The Issuance of Permanent Injunctions is Neither Necessary nor Warranted

The SEC's request for the issuance of permanent injunctions is not warranted because there is not a substantial likelihood that Defendants will violate the securities laws in the future and because the equities weigh against such a drastic measure.  Each of these points is addressed separately below.

#### 1. There is No Substantial Likelihood of Future Violation

To obtain a permanent injunction, "[t]he SEC must demonstrate that there is a substantial likelihood of ***future*** violations of illegal securities conduct."  *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998) (emphasis added); *see also SEC v. Gentile*, 939 F.3d 549, 556 (3d Cir. 2019) (citing *SEC v. Torr*, 87 F.2d 446, 450 (2d Cir. 1937)) ("Unless the agency shows a real threat of future harm, 'there is in fact no lawful purpose to be served' by a preventive injunction."); *see also Aaron v. SEC*, 446 U.S. 680, 703 (1980) (citing *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90 (2d Cir. 1978)) ("[T]he Commission must establish a sufficient evidentiary predicate to show that such future violation may occur.").  The purpose of SEC injunctions is to ***deter*** the violator from future infraction and ***not to punish*** past misconduct.  *See e.g., SEC v. Graham*, 823 F.3d 1357, 1361–62 (11th Cir. 2016); *SEC v. Steadman*, 967 F.2d 636, 648 (D.C. Cir. 1992); *SEC v. Savoy Indus., Inc.*, 587 F.2d 1149, 1169 (D.C. Cir. 1978); *SEC v. Geon Indus., Inc.*, 531

F.2d 39, 54–56 (2d Cir. 1976). "If an injunction cannot be supported by a meaningful showing of actual risk of harm, it must be denied as a matter of equitable discretion." *Gentile*, 939 F.3d at 556.[1]

Recognizing that the likelihood of future violations is paramount to the issuance of an injunction, there is no greater predictor of a person's future actions than his prior conduct. In this regard, two facts cry out. First, Defendants immediately discontinued the syndicate offering business in advisory accounts the day they were advised the offerings were problematic. Second, Defendants promptly reported their conduct to their regulators. These actions are far more predictive of Defendants' future conduct than the violations focused on by the SEC that preceded the self-reporting.

The trial testimony in this case was clear, unequivocal, and unrebutted on these two points. Mr. McClure testified at length about the discovery of the section 206(3) violation and the immediate cessation of that activity. Trial Tr. at 661:20-22 ("Well, I was shocked. I was very concerned. And the first thing we did was we immediately stopped doing this type of business, immediately."); Trial Tr. at 676:12-15 (Q: "When did Westport stop distributing new stock offering to its advisory clients?" A: "When we found out there might be a problem, in July 2015, we stopped cold."). He was equally clear on the issue of self-reporting. Trial Tr. at 662:4-5 ("We decided to self-report this issue to our regulators, to FINRA and to the SEC."). *Accord*, the Declaration of Susan E. Bryant, Esq. attached herewith. The fact that **Mr. McClure** brought the

---

[1] To evaluate whether there is a substantial likelihood of future violations of the securities laws, courts traditionally look to the following factors: (1) the fact that a defendant has been found liable for illegal conduct; (2) the degree of scienter involved; (3) whether the infraction is an isolated occurrence; (4) whether the defendant continues to maintain that his past conduct was blameless; and (5) whether the defendant might be in a position where future violations could be anticipated. *SEC v. Cavanagh*, 155 F.3d 129 (2d Cir. 1998) (citations omitted).

matter to the attention of the regulators speaks volumes about the likelihood of recurrence.  No one who "blows the whistle on themselves" is a likely candidate for repetition.[2]

Second, the impact of this case on Mr. McClure, both emotionally and financially, has been so profound that it is difficult to conceive of repetition in the future.  Mr. McClure has been consumed by this case for five and a half years now, responding to voluminous SEC requests for information, meeting constantly with lawyers, reviewing briefs and pleadings, sitting for numerous depositions, and preparing for and participating in a week-long trial, all the while managing to meet the needs and expectations of his firm and clients.  The experience has left an indelible imprint on him.

The financial impact to both Westport and Mr. McClure has been equally profound.  As detailed more fully in section II.D. of this memorandum, Westport has lost millions of dollars in business in the form of lost accounts, departed brokers and dramatically reduced revenue.  Mr. McClure is himself nearly impecunious.  *See* Exhibit A filed herewith.  Neither will be able to fully recover and the deep impact this case has made on Mr. McClure makes the question of repetition unfathomable.

One other factor supports the conclusion that such conduct is unlikely to recur: the conduct is *very* old.  It began roughly ten years ago and ended five and a half years ago upon discovery of the violations.  Neither Mr. McClure nor Westport had any disciplinary history prior

---

[2] Counsel for Defendants submit that Mr. McClure's self-reporting is a critical factor at this stage in the proceedings.  The Court can and should fashion remedies and penalties that encourage self-reporting.  Adopting the SEC's proposal, which completely ignores Mr. McClure's self-reporting, would send the opposite message and ***discourage*** voluntary disclosure going forward.

to the events giving rise to this case and there has been no repetition since the conduct ended and was self-reported five and a half years ago.[3]

The public interest in this case has been served by virtue of the jury verdict which brands Mr. McClure forever a fraudster. There is nothing more to accomplish through the issuance of an injunction other than to punish him, an approach expressly prohibited by law. *See Hecht Co. v. Bowles*, 321 U.S. 321, 329 (1944) ("[t]he historic injunctive process was designed to deter, not to punish"); *see also SEC v. Geon Indus., Inc.*, 531 F.2d at 54–56. Considering the extreme unlikelihood of a violation recurring, an injunction should not issue.

## 2. The Collateral Consequences of an Injunction Are Significant

Applicable notions of judicial fairness further dictate against the issuance of an injunction.[4] Immediately following the entry of a final judgment the SEC will institute an administrative proceeding against Defendants seeking, among other things, to have Mr. McClure permanently barred from the securities industry. *See* Section 203(f) of the Investment Advisers Act of 1940 ("Advisers Act"), 15 U.S.C. §80b-3(f). In that proceeding an administrative law judge will have to consider factors very similar to those presently before the Court.[5] The

---

[3] *Accord, CFTC v. Kelly*, 736 F. Supp. 2d 801, 803 (S.D.N.Y. 2010) (passage of time may itself be adequate to vacate an "obey-the-law" injunction); *see also SEC. v. Alexander*, 2013 WL 5774152 (E.D.N.Y. Oct. 24, 2013) (same).

[4] "[I]n deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts." *Gentile*, 939 F.3d at 17 (quoting *SEC v. Manor Nursing Ctrs., Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972)). Accordingly, the adverse effect of an injunction upon Defendants is a factor to be considered by the district court in exercising its discretion. *Manor Nursing Ctrs.*, 458 F.2d at 1102; *see Aaron v. SEC*, 446 U.S. 680, 703 (1980) (Burger, C.J., concurring) ("An [SEC] injunction is a drastic remedy, not a mild prophylactic"); *SEC v. Warren*, 583 F.2d 115, 122 (3d Cir. 1978) (weighing hardship to defendant in assessing injunction's dissolution). "In other words, the harsh effects of an SEC injunction demand that it not be imposed lightly or as a matter of course, that it be imposed only upon a meaningful showing of necessity . . ." *Gentile*, 939 F.3d at 17.

[5] The factors considered by an administrative law judge are sometimes referred to as the "Steadman factors" and are derived from the case *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979), aff'd on other grounds, 450 U.S. 91 (1981). The factors include: (1) the egregiousness of the respondent's actions; (2) the isolated or recurrent nature of the infraction; (3) the degree of scienter involved; (4) the sincerity of the respondent's assurances against future

6

decision made by the Court on the need for an injunction will be highly influential, if not dispositive, in a subsequent administrative proceeding. The stakes for Mr. McClure could not be higher.[6]

### B. The Majority of the SEC's Disgorgement Request is Improper

The majority of the SEC's disgorgement request – the part that relates to dealer concession income derived from the selling dealer offerings -- is improper because it is not reasonably related to the conduct that served as the basis for the jury's verdict, as explained below.[7]

"The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1474–75 (2d Cir. 1996). A disgorgement award constitutes permissible equitable relief only if it does not exceed a wrongdoer's net profits and is awarded for victims under 15 U.S.C. §78u(d)(5) or one of its counterparts.[8] *Liu v. SEC*, 140 S. Ct. 1936, 1942-1950 (2020). As the Supreme Court recently explained in *Liu,* courts may not enter disgorgement awards that exceed the gains "made upon [the] business or investment, when both the receipts and payments are taken into the account." *Id*. at 1945. The Court's holding was premised on its interpretation of the language in the statute authorizing the SEC to pursue disgorgement, 15 U.S.C. §78u(d)(5),

---

violations; (5) the respondent's recognition of the wrongful nature of his conduct; and (6) the likelihood of future violations.

[6] In essence, the issuance of an injunction is the professional equivalent of the "death sentence" in the securities industry. *Saad v. SEC,* 718 F.3d 904, 906 (D.C. Cir. 2013) (stating that consideration of a disciplinary sanction is "particularly important when the respondent faces a lifetime bar, which is 'the securities industry equivalent of capital punishment'") (citing *PAZ Sec. Inc. v. SEC,* 494 F.3d 1059, 1065 (D.C. Cir. 2007)).

[7] In section II.D. below, we address Westport and Mr. McClure's current financial condition and make the point that neither has the ability to pay disgorgement or a civil penalty regardless of the matters addressed in this section B.

[8] In this case, brought under the Investment Advisers Act of 1940, the relevant section is 15 U.S.C §80b-3(j).

which allows courts to grant such "equitable relief [as] may be appropriate or necessary for the benefit of investors." The SEC's request for disgorgement is neither appropriate nor necessary for the benefit of investors because there is no reasonable relationship between Defendants' gains -- the dealer concession income received from underwriters -- and the measure of disgorgement urged by the SEC here -- the net trading losses of 25 Westport clients (some of whom made money and some of whom lost money) over a five-year period.

In this case the SEC has calculated that Westport and Mr. McClure received approximately $546,019 in dealer concession income from selling dealer transactions, ***none of which came from or was charged to Westport's clients***. To the contrary, the income Westport and Mr. McClure derived from the selling dealer offerings was paid by ***the underwriters***. *See, e.g.,* Trial Tr. at 78-79, 99:7-15. The SEC's own counsel admitted as much to the Court at trial: "In the selling dealer offerings, the client pays exactly what everybody else pays . . . [a]nd so it doesn't come directly from the client." Trial Tr. at 281:17-19. Nonetheless, the SEC proposes to take the selling dealer income from Defendants and redistribute it to certain of Westport's clients. Because these advisory clients did not pay the selling dealer offering compensation, disgorgement is not appropriate or necessary. Instead, such disgorgement of the dealer concessions to investors would be an inequitable windfall in contravention of the Supreme Court's clear holding in *Liu*.

Recognizing – as they must – that the $546,019 in dealer concession income does not constitute an "investor loss," the SEC seeks to perform an intellectual sleight of hand, substituting the alleged net trading losses incurred in syndicate transactions by 25 Westport clients as an "alternative" justification for disgorgement.[9] Such an approach runs directly

---

[9] No evidence was presented at trial to the jury on the issue of net trading gains or losses.

contrary to *Liu,* however, which requires that any equitable "profits-based remedy" be just that – a ***profits-based*** remedy.[10]  Whether some Westport clients lost some money, made some money, or were net winners or losers of a particular type of investments bears no relevance to the funds paid to Westport by the underwriters of the selling dealer offerings.  Accordingly, the SEC's claim for the disgorgement of dealer concession income is fatally flawed and should be denied.

In sharp contrast, the SEC's request for disgorgement of the $86,935 in 12b-1 fees received by Defendants *is* appropriate because it is consistent with the jury's verdict and the evidence presented on that issue.[11]  Mr. McClure's proposal to satisfy this sum is discussed in section II.D. below.

### C.  Civil Penalties Are Not Necessary to Punish Defendants

The purpose of civil penalties is to punish violators and deter future violations of the securities laws.  *SEC v. Opulentica,* 479 F. Supp. 2d 319, 332 (S.D.N.Y. 2007).  In determining whether civil penalties should be imposed and the amount of the fine, courts consider: (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition."  *SEC v. DiBella*, No. 3:04-cv-1342, 2008 WL 6965807, *6 (D. Conn. Mar. 13, 2008).  While these factors are helpful, the civil penalty framework is of a "discretionary nature" and

---

[10] As the Court in *Liu* explained, "the SEC's equitable, profits-based remedy must do more than simply benefit the public at large by virtue of depriving a wrongdoer of ill-gotten gains." *Id.* at 1948.  "The equitable nature of the ***profits remedy*** generally requires the SEC to return a defendant's gains to wronged investors for their benefit." *Id.* (emphasis added).

[11] *See* Jury Verdict Form (Dkt. No. 121) at Findings 4.b and d.

9

each case has "its own particular facts and circumstances which determine the appropriate penalty to be imposed." *SEC v. Moran*, 944 F. Supp. 286, 296-97 (S.D.N.Y. 1996).

Here, the civil penalties requested by the SEC are not necessary to punish Defendants or to deter future violations of the securities laws and are inconsistent with the level of civil penalties imposed in similar cases. As previously stated, upon entry of judgment, both Defendants will be subject to statutory disqualification from the securities industry which will effectively require Westport to shutter its doors and eliminate Mr. McClure's ability to operate as a broker-dealer or investment adviser representative.[12] An additional monetary penalty is unnecessary to impress further upon Defendants the seriousness of their violations. As to the deterrence of future conduct, Defendants immediately discontinued all syndicate offerings in advisory accounts and promptly reported their conduct to the regulators. Defendants have demonstrated a clear understanding that this conduct was in violation of the securities laws and are not a risk to repeat such conduct ever again.

Lastly, the level of civil penalties requested by the SEC here is grossly disproportionate to the penalties imposed in *any other reported case* involving principal transactions. *See In the Matter of Palmer Square Capital Management LLC*, Adm. Proc. File No. 3-20039 (Sept. 21, 2020); *In the Matter of Lone Star Value Management and Jeffrey Eberwein*, Adm. Proc. File No. 3-19706 (February 24, 2020); *In the Matter of Ophrys, LLC*, Adm. Proc. File No. 3-18815 (September 21, 2018); *In the Matter of John Tarpinian* Adm. Proc. File No. 3-18337 (January 17, 2018); *In the Matter of Moloney Securities* Co*., Inc. and Joseph R. Medley, Jr.*, Adm. Proc.

---

[12] "Statutory disqualification," as defined under Section 3(a)(39) of the Securities Exchange Act of 1934 ("the Exchange Act"), prevents a person under a statutory disqualification from SRO membership or participation or association with a broker-dealer. 15 U.S.C. §78c (39)(A)-(F). While FINRA and the SEC have procedures for disqualified firms and individuals to request permission to operate despite a statutory disqualification, the likelihood of either defendant obtaining such an exemption is low. The statutory disqualification applies regardless of whether the SEC seeks to bar Westport or Mr. McClure administratively in a subsequent proceeding.

File No. 3-17604 (September 30, 2016); *In the Matter of Highland Capital Management, L.P.*, Adm. Proc. File No. 3-16169 (September 25, 2014); *In the Matter of Paradigm Capital Management, Inc. and Candace King* Weir, Adm. Proc. File No. 3-15930 (June 16, 2014); *In the Matter of Parallax Investments, LLC, John P. Bott, II, and F. Robert Falkenberg*, Adm. Proc. File No. 3-15626 (November 26, 2013).

In four of the eight cases located involving principal transactions, the conduct was far more egregious because advisory clients had been charged fees in connection with the principal transactions in addition to the advisory firms' failures to disclose their roles in the transactions. *See In the Matter of Palmer Square Capital Management LLC* (September 21, 2020); *In the Matter of John Tarpinian* (January 17, 2018); *In the Matter of Paradigm Capital Management, Inc.* (June 16, 2020); *In the Matter of Parallax Investments, LLC, John P. Bott, II, and F. Robert Falkenberg* (November 26, 2013)). In three of the cases no individual was even named. *See In the Matter of Highland Capital Management, L.P.* (September 25, 2014); *In the Matter of Ophrys, LLC* (September 21, 2018); *In the Matter of Palmer Square Capital Management LLC* (September 21, 2020). **Every one of the cases** involved substantially lower penalties.[13] Based

---

[13] *In the Matter of Palmer Square Capital Management LLC* (September 21, 2020) ($450,000 civil penalty to entity only); *In the Matter of Lone Star Value Management and Jeffrey Eberwein* (February 24, 2020) ($100,000 civil penalty to entity and $25,000 civil penalty to individual); *In the Matter of Ophrys, LLC* (September 21, 2018) ($500,00 civil penalty to entity only); *In the Matter of John Tarpinian* (January 17, 2018) ($25,000 civil penalty to individual); *In the Matter of Moloney Securities Co., Inc. and Joseph R. Medley, Jr.* (September 30, 2016) ($34,000 civil penalty to entity and $7,500 penalty to individual); *In the Matter of Highland Capital Management, L.P.* (September 25, 2014) ($225,000 civil penalty to entity only); *In the Matter of Paradigm Capital Management, Inc. and Candace King Weir* (June 16, 2014) ($300,000 joint and several civil penalty to entity and individual); *Parallax Investments, LLC, John P. Bott, II, and F. Robert Falkenberg* (November 26, 2013) ($200,000 civil penalty to entity, $70,000 civil penalty to one individual, $40,000 civil penalty to another individual).

on the forgoing – as well as on the discussion that follows regarding financial inability to pay -- the SEC's request for civil penalties should be denied.

### D. Defendants Are Financially Unable to Pay the Majority of Disgorgement or a Civil Penalty

"The district court has broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *First Jersey Sec.*, Inc., 101 F.3d 1450, 1474–75 (2d Cir. 1996). The district court may, in its discretion, consider a defendant's ability to pay disgorgement when fashioning its relief. *See SEC v. Huffman*, 996 F.2d 800, 803 (5th Cir. 1993); *see also SEC v. Seghers*, 298 Fed. Appx. 319, 337 n.18 (5th Cir. 2008); *SEC v. Pardue*, 367 F. Supp. 2d 773, 778 (E.D. Pa. 2005); *see also SEC v. DiBella*, No. 3:04-cv-1342, 2008 WL 6965807, *6 (D. Conn. Mar. 13, 2008). Additionally, a respondent's ability to pay is a relevant factor in determining civil penalties under the Securities Act, Exchange Act, Investment Company Act, and Advisers Act. *See* 15 U.S.C. §§ 77h-1(g)(3), 78u-2(d), 80a-9(d)(4), 80b-3(i)(4). When a defendant or respondent demonstrates an inability to pay disgorgement and civil penalties, the amount requested by the SEC may be reduced or waived. *SEC v. Global Financial Traders, Ltd., et al.*, Docket No. 97 Civ 1753 (DC), (USDC SDNY); *SEC v. Druffner*, 802 F. Supp. 2d 293 (D. Mass. 2011); *In re Scott M. Stephan*, Initial Dec. No. 888 (Sept. 25, 2015); *In re Angelica Aguilera*, Initial Dec. No. 501 (July 31, 2015).

In this case, neither Westport nor Mr. McClure possesses the ability to pay the majority of disgorgement requested by the SEC or a civil penalty. Moreover, their inability to pay will only intensify following the entry of a final judgment, which will statutorily disqualify both Westport and Mr. McClure from operating in the securities industry.

Westport's financial condition has deteriorated dramatically since the filing of the SEC's complaint in December of 2017. It has lost ▮ client accounts totaling ▮ in assets,[14] and net income has been *net negative* over the same three-year period (2018-2020).[15] Legal and professional fees directly attributable to the investigation and defense of this case exceed ▮ million and firm revenue has plummeted by roughly ▮. To keep Westport afloat, Mr. McClure has made ▮ in capital contributions to the firm (net) over the past four years. Westport's current financial condition, as well as its performance over the past ten years, is detailed in Exhibit A.

Mr. McClure's personal financial condition is worse than the firm's condition. He has listed the particulars of his financial condition in detail utilizing the SEC's prescribed financial affidavit (SEC Form D-A), which accompanies this filing. As the form indicates, Mr. McClure has expended ▮ *more* than he has taken in over the past twelve months and roughly half of the proceeds used to pay his expenses during this period have come from loans and IRA

---

[14] Westport's lost assets and accounts from 2017 to the present are as follows:

| Representative | Assets Lost | Accounts Lost |
|---|---|---|
| McClure | ▮ | ▮ |
| Lawton | | |
| Miller | | |
| Fava | | |
| Morris | | |
| Batick | | |
| **TOTALS** | | |

[15] Westport's profit and loss totals (net income) from 2015 through 9/30/20 are as follows:

| Year | Revenue | Expenses | Net Income (Loss) |
|---|---|---|---|
| 2020 (9/30) | ▮ | ▮ | ▮ |
| 2019 | | | |
| 2018 | | | |
| 2017 | | | |
| 2016 | | | |
| 2015 | | | |

distributions he has been forced to take, as well as a substantial, non-recurring tax refund.[16] His total net worth is currently ▮▮▮ and that includes the value of the residence, which is owned solely in his wife's name, and the value of his ownership in Westport, which is essentially illiquid.[17] When the marital residence and illiquid "equity" in the business are subtracted, Mr. McClure's total net worth is **negative** ▮▮▮.[18] His liquid assets are virtually nonexistent.[19]

    Notwithstanding any of the forgoing, Mr. McClure recognizes his responsibility to reimburse clients who paid 12b-1 fees. Given his precarious financial condition, however, Mr. McClure is unable to effectuate reimbursement of the 12b-1 fees immediately, and thus requests a monthly installment plan over a period of years. Regarding the SEC's request for disgorgement of dealer concessions and the payment of civil payments, not only are such payments wholly unwarranted, but Defendants lack the means to pay any such amounts and thus request a waiver of disgorgement and civil penalties based on their demonstrated inability to pay.

## IV. CONCLUSION

    Because there is no reasonable likelihood of repetition here and because of Westport and Mr. McClure's dire financial condition, the SEC's requests for permanent injunctions, disgorgement, prejudgment interest, and civil penalties should be denied except to the extent identified above.

---

[16] When loans and IRA distributions are excluded, Mr. McClure's net income over the past twelve months was **minus** ▮▮▮.

[17] Mr. McClure's interest in Westport is valued in his Financial Declaration (Exhibit A) as ▮▮▮ (as of 11/30/20). That sum is composed of primarily two parts. One part is the ▮▮▮ Westport is required by FINRA to maintain on deposit at its clearing firm at all times (its "net capital requirement"). The other part – which varies significantly from month to month – is the balance available in the firm's checking account, which serves two purposes: one is to satisfy its clearing firm it has sufficient assets to continue operating as a broker-dealer; the other is to be able to meet current firm expenses as they come due. The firm has no other reserves or tangible assets.

[18] *See* Form D-A at 2.

[19] *Id.*

                    Respectfully submitted,

                    LEVAN LEGAL LLC

                    By: */s/ Richard A. Levan*
                    Richard A. Levan, Esq. phv09871
                    Jon-Jorge Aras, Esq. phv09947
                    Two Bala Plaza
                    Suite 300
                    Bala Cynwyd, PA 19004
                    610-688-7781
                    rlevan@levan.legal
                    jjaras@levan.legal

                    and

                    SPEARS MANNING & MARTINI LLC

Dated: January 11, 2021          By: */s/ Brian E. Spears*
                    Brian E. Spears. Esq. ct14240
                    2425 Post Road, Suite 203
                    Southport, CT 06890
                    203-292-9766
                    bspears@spearsmanning.com

                    ***Counsel for Defendants***
                    ***Westport Capital Markets, LLC and***
                    ***Christopher E. McClure***

**CERTIFICATE OF SERVICE**

    I hereby certify that on January 11, 2021, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing. Parties may access this filing through the Court's CM/ECF system.

                                            */s/ Jon-Jorge Aras*
                                            Jon-Jorge Aras