## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

SECURITIES AND EXCHANGE
COMMISSION,
    *Plaintiff*,

    v.

WESTPORT CAPITAL MARKETS, LLC
and CHRISTOPHER McCLURE,
    *Defendants*.

No. 3:17-cv-02064 (JAM)

## ORDER GRANTING IN PART AND DENYING IN PART
## MOTION FOR ENTRY OF FINAL JUDGMENTS

This case is a long-running civil enforcement action brought by the U.S. Securities and

Exchange Commission against Westport Capital Markets, LLC, and its owner and chief

executive officer, Christopher E. McClure, for failing to comply with their disclosure obligations

under the Investment Advisers Act. The case has proceeded through summary judgment and

trial. I granted summary judgment in favor of the SEC on three of its claims, and the jury at trial

returned a verdict for the SEC on the two remaining claims.

The SEC now moves for the entry of final judgments, seeking a permanent injunction

against defendants from future violations of the securities laws, disgorgement of $632,954 along

with prejudgment interest, and civil penalties of $1,100,000 against Westport and $225,000

against McClure. I will deny the SEC's motion to the extent that it seeks injunctive relief, but I

will grant the SEC's full disgorgement request and will grant in part the SEC's request for civil

penalties by imposing civil penalties of $500,000 against Westport and $200,000 against

McClure. Final judgment shall enter against Westport in the amount of $1,320,761 and against

McClure in the amount of $1,020,761.

This case's long history is detailed in several of my prior rulings, which I incorporate by reference.[1] Westport was a financial investment company that advised and invested funds on behalf of a wide range of clients. McClure was Westport's owner, president, and chief compliance officer. Westport was dually registered under the securities laws as both a broker-dealer and an investment adviser. *See SEC v. Westport Capital Markets LLC*, 2020 WL 6270698, at *1 (D. Conn. 2020).

The SEC alleged that Westport and McClure had a long-running conflict of interest that was neither adequately disclosed to their clients nor disclosed to the SEC as required under the Investment Advisers Act of 1940, 15 U.S.C. § 80b-1 *et seq*. There were two streams of income from third-party sources that the SEC alleged were not adequately disclosed to Westport clients. The first and largest was income from so-called "selling dealer" syndicate offerings. *Id*. at *2. Westport would buy for its own account an allocation of initial public syndicated share offerings at a discount from the public offering price and then resell these securities to its advisory clients at the public offering price, earning as it did so a selling concession for the shares that were sold to the clients. *Ibid*. Because these transactions involved the sale of shares to clients from Westport's own proprietary account, they were "principal" transactions within the meaning of the securities laws and subject to special disclosure and consent rules. *Ibid*.

The second stream of income came from so-called "12b-1 fees," which were distribution fees that were paid to Westport by mutual funds in conjunction with certain mutual fund investments and which were ultimately charged by the mutual fund to the investor client. *Ibid*.

---

[1] *See SEC v. Westport Capital Markets LLC*, 2020 WL 6270698 (D. Conn. 2020); *SEC v. Westport Capital Markets LLC*, 408 F. Supp. 3d 93 (D. Conn. 2019); *SEC v. Westport Capital Markets LLC*, 2019 WL 4857337 (D. Conn. 2019).

These 12b-1 fees are often avoidable: they are charged only for investments in certain share classes of a mutual fund, such that it may be possible to purchase a different share class of the same mutual fund that is not accompanied by 12b-1 fees. *Ibid*.

The SEC filed a complaint including five counts.[2]

- Count One alleges that Westport and McClure intentionally, knowingly, or recklessly defrauded their clients, in violation of section 206(1) of the Investment Advisers Act, 15 U.S.C. § 80b-6(1).

- Count Two alleges that Westport and McClure negligently engaged in practices that operated as a fraud or deceit on their clients, in violation of section 206(2) of the Investment Advisers Act, 15 U.S.C. § 80b-6(2).

- Count Three alleges that Westport sold its advisory clients securities that Westport owned without disclosing to those clients its "principal" status and without obtaining client consent for each transaction, in violation of section 206(3) of the Investment Advisers Act, 15 U.S.C. § 80b-6(3).

- Count Four alleges that McClure aided and abetted Westport in the conduct complained of in Count Three, in violation of section 209(f) of the Investment Advisers Act, 15 U.S.C. § 80b-9(f).

- Count Five alleges that Westport and McClure willfully made untrue statements in their filings with the SEC, in violation of section 207 of the Investment Advisers Act, 15 U.S.C. § 80b-7.

I granted the SEC summary judgment as to Counts Two, Three, and Four of the complaint. As to Count Two, I concluded in relevant part that there was no genuine issue of fact on the SEC's claim that Westport and McClure had failed to adequately disclose their conflict of interest to advisory clients and that they acted at least negligently in failing to do so. As I explained in my ruling, it was undisputed that Westport and McClure were afflicted with a conflict of interest as a result of their receipt of selling dealer concession fees and their receipt of mutual fund 12b-1 fees, and it was likewise undisputed that no one at Westport ever had a

---

[2] Doc. #1.

conversation with any of their clients to explain that they were receiving this extra income in connection with the management of their accounts. *See SEC v. Westport Capital Markets LLC*, 408 F. Supp. 3d 93, 101 (D. Conn. 2019).

Although Westport and McClure argued that they adequately disclosed their conflicts of interest in their Forms ADV—regulatory forms that were periodically transmitted both to defendants' clients and to the SEC—I held that their statements were too vague, conditional, and contradictory to suffice as a legally adequate disclosure of their receipt of the extra income and the conflict of interest that this engendered. *Id*. at 104-05. I further concluded that, to the extent that Westport and McClure argued that they relied on advice from their compliance consultant for their inadequate disclosures, they were at least negligent under an objective reasonableness standard because Westport's contract with Regulatory Compliance, LLC—which was signed by McClure on Westport's behalf—did not relieve Westport from its own responsibility to comply with the law and disavowed the consultant's issuance of legal advice about compliance with the securities laws. *Id*. at 107-08.

As to Count Three, I granted the SEC's motion for summary judgment because there was no dispute that Westport's sale to its clients from its own account of selling dealer shares constituted "principal" transactions and that "there is not the slightest bit of evidence that Westport secured its clients' consent to any of these [principal] transactions." *Id.* at 109.

As to Count Four, I granted the SEC's motion for summary judgment because I concluded that "McClure doubtlessly knew that neither he nor anyone at Westport was informing clients in advance of Westport's position as a principal in these transactions," and that "he doubtlessly knew that neither he nor anyone at Westport ever obtained the clients' consent" for Westport's participation as a principal in the selling dealer transactions. *Id.* at 110.

I otherwise denied the SEC's motion for summary judgment as to Counts One and Five of the complaint. For both counts, I concluded that genuine fact issues remained about whether Westport and McClure had acted with the heightened state of mind (*scienter*) that these counts required the SEC to prove. *Id*. at 105-06, 110-11.

The case went to trial on Counts One and Five, and the jury ruled across-the-board in favor of the SEC and against Westport and McClure. *See Westport Capital Markets LLC*, 2020 WL 6270698, at *10. The jury instructions reviewed each of the elements of Counts One and Five but told the jury that only those elements bearing on the issue of *scienter* were in dispute. *Ibid*. With respect to those disputed elements, the jury concluded as to Count One that both Westport and McClure intentionally or recklessly failed to make the required disclosure of compensation from selling dealer offerings and compensation from 12b-1 fees. *Ibid*. Similarly, the jury concluded as to Count Five that when Westport and McClure "answered 'no' in Part I of the Forms ADV to a question whether Westport engaged in principal transactions with its advisory clients, [they] did so knowing that the answer was untrue." *Ibid*. And the jury concluded as to Count Five that when Westport and McClure "failed to disclose the receipt of 12b-1 fees from the sale of mutual funds on its Forms ADV, [they] did so knowing that [they were] omitting information that was required to be disclosed." *Ibid*.

Westport and McClure then moved for judgment as a matter of law or a new trial on several grounds, and I denied their motion. *Id*. at *16. As is relevant here, I concluded that the evidence was easily sufficient for a jury to conclude that both Westport and McClure acted intentionally or recklessly in failing to adequately disclose their conflicts of interest to their clients and that they acted willfully in falsely claiming to the SEC that they did not engage in principal transactions and in failing to disclose to the SEC their receipt of 12b-1 fees. *Id*. at *11. I

described how the evidence showed that Westport and McClure pervasively engaged in conflicted selling dealer and 12b-1 fee transactions for several years and that they earned hundreds of thousands of dollars from doing so. *Id*. at *12. These undisclosed earnings amounted to about 50 percent of what they otherwise legitimately earned from their clients' payment of advisory fees. *Ibid*.

For the selling dealer transactions, I explained that the SEC showed without contradiction that Westport and McClure invested dozens of their advisory clients in scores of selling dealer offerings involving principal transactions, generating more income that was not disclosed to the clients. *Id*. at *5. The SEC's evidence showed that from 2012 to 2015 Westport generated about $550,000 in net income from its sales of syndicated selling dealer shares to its advisory clients. *Ibid*. More than 1,000 of these selling dealer transactions were engaged in for advisory clients under McClure's personal management, and McClure personally received distributions of nearly $550,000 from 2012 to 2015 as a result of the income generated by Westport from its sale of selling dealer offering shares to its advisory clients. *Ibid*. Contrary to their clients' conservative investment preferences, these selling dealer transactions most often involved shares that had no credit rating at all or that were rated as "junk" or below-investment-grade quality; only 7.6% of these selling dealer offerings involved investment-grade securities. *Ibid*.

With respect to the 12b-1 fees, Westport earned more than $105,000 from 12b-1 fees charged to its advisory clients for their mutual fund investments. *Ibid*. Nearly half of these 12b-1 fees were earned after Westport had switched to a less cumbersome trading platform in April 2015, and more than 90 percent of them were attributable to the purchase of mutual funds that had alternative non-12b-1 fee-charging share classes. *Id*. at *10 & n.43. Furthermore, McClure admitted that he failed to transfer his clients' mutual funds that were generating 12b-1 fees to a

class that would not generate 12b-1 fees and that he did not systemically transfer his clients' accounts away from non-12b-1 fee-paying shares until October 2017 at the brink of the onset of this litigation. *Id.* at *10.

Overall, I found a reasonable jury could have concluded that this large of a financial gain did not happen by accident—and that the size of the gain was a powerful motive for Westport and McClure to intentionally or recklessly keep their clients and the SEC in the dark about how they were earning this money. *Id*. at *12. I also noted the jury could well have concluded in light of the evidence that the decision of Westport and McClure to invest a large proportion of these clients' accounts in mostly speculative and unrated selling dealer offerings reflected Westport and McClure's intentional or reckless decision to place their personal and undisclosed pecuniary interests above their clients' stated investment preferences. *Ibid*.

The SEC now moves for the entry of final judgments, seeking to permanently enjoin defendants from future violations of the securities laws, a disgorgement award of $632,954 along with prejudgment interest, and civil penalties of $1,100,000 against Westport and $225,000 against McClure.[3] Defendants object to the SEC's motion except with respect to a disgorgement award of $86,935 on grounds that a permanent injunction and civil penalties are not necessary to punish or deter defendants, that disgorgement is improper for the selling dealer transactions, and that defendants have no ability to pay the SEC's requested monetary remedies.[4] The SEC has filed a reply, and defendants have filed a sur-reply.[5] I heard oral argument on February 26, 2021, and this ruling now follows.

---

[3] Doc. #152.

[4] Doc. #159.

[5] Doc. #167; Doc. #168.

The SEC moves for entry of final judgments against Westport and McClure, including permanent injunctive relief, disgorgement, and civil penalties. I will address each remedy that the SEC seeks in turn.

### *Permanent injunction*

The SEC requests that the Court "permanently enjoin the defendants against future violations of the Advisers Act as well as specifically enjoin them from repeating their fraudulent conduct of engaging in conflicted transactions without disclosure."[6] Westport and McClure oppose injunctive relief on grounds that there is no substantial risk of future violations and that entry of an injunction would create significant collateral consequences.[7]

The Investment Advisers Act provides that a court "shall" grant a permanent or temporary injunction "[u]pon a showing that such person has engaged, is engaged, or is about to engage in any such act or practice" constituting a violation of the Act. 15 U.S.C. § 80b-9(d). This language has been understood to mean that there must be a showing of a "likelihood or propensity to engage in future violations," but that trial courts have "considerable discretion in granting injunctive relief pursuant to this section." *SEC v. Rashid*, 2020 WL 5658665, at *25 (S.D.N.Y. 2020).[8]

---

[6] Doc. #152-1 at 7. Specifically, the SEC requests that the Court permanently enjoin defendants against future violations of sections 206(1), 206(2), 206(3), and 207 of the Investment Advisers Act. Doc. #152-3 at 1-2; Doc. #152-4 at 1-2. In addition, the SEC requests that the defendants be "permanently restrained and enjoined from receiving any compensation, beyond an advisory fee, from an advisory client's purchase or sale of securities or other investment products unless the following is disclosed, in writing, before the completion of each transaction: (i) the type of compensation; (ii) the recipients of the compensation; (iii) the amount of compensation (or an annual approximation of any compensation, such as with trailing fees from mutual funds); and (iv) the corresponding conflict of interest." Doc. #152-3 at 3; Doc. #152-4 at 3.

[7] Doc. #159 at 3-6.

[8] Unless otherwise indicated, this ruling omits internal quotation marks, alterations, citations, and footnotes in text quoted from court decisions.

In determining whether to issue a permanent injunction, courts consider the following factors: "the fact that the defendant has been found liable for illegal conduct; the degree of scienter involved; whether the infraction is an 'isolated occurrence;' whether defendant continues to maintain that his past conduct was blameless; and whether, because of his professional occupation, the defendant might be in a position where future violations could be anticipated." *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998); *Rashid*, 2020 WL 5658665, at *26 (applying *Cavanagh* factors to violations under section 206).

Additionally, "in deciding whether to grant injunctive relief, a district court is called upon to assess all those considerations of fairness that have been the traditional concern of equity courts. Accordingly, the adverse effect of an injunction upon defendants is a factor to be considered by the district court in exercising its discretion." *SEC v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1102 (2d Cir. 1972) (citing *Hecht Co. v. Bowles*, 321 U.S. 321, 328-30 (1944)). "The historic injunctive process was designed to deter, not to punish." *Hecht*, 321 U.S. at 329; *see also SEC v. Gentile*, 939 F.3d 549, 562 (3d Cir. 2019) ("[i]njunctions may not be supported by the desire to punish the defendant or deter others, so courts abuse their discretion when they issue or broaden injunctions for those reasons").

On balance, I am not persuaded that there is a reasonable likelihood that defendants will engage in future violations of securities laws. To be sure, the trial "evidence showed that Westport and McClure pervasively engaged in conflicted selling dealer and 12b-1 fee transactions for several years and that they earned hundreds of thousands of dollars from doing so." *Westport Capital Markets LLC*, 2020 WL 6270698, at *12. The jury's verdict establishes that Westport and McClure acted with *scienter* with respect to both the selling dealer transactions and 12b-1 fees, and that they willfully made false statements in their filings with the SEC. *Id.* at

\*10. Those aspects of the evidence and the verdict weigh in favor of a finding of a reasonable likelihood of future violations. *See, e.g., Manor Nursing Centers*, 458 F.2d at 1100; *SEC v. Fowler*, 440 F. Supp. 3d 284, 301-02 (S.D.N.Y. 2020).

But several factors weigh in the other direction. To start, Westport has already or will soon close its doors, and although my understanding is that McClure intends to stay in the financial services industry, he will no longer be in the same type of position of authority as he held when serving as Westport's owner, president, and chief compliance officer.[9] As a result, there is a substantially decreased likelihood that McClure—let alone Westport—will be in a position where similar violations of the securities laws can be anticipated in the future.

The SEC also has not introduced any evidence to suggest that defendants have engaged in any violations of the securities laws since 2017, even though they have continued operating since then. Indeed, at oral argument, the SEC admitted that it has not attempted to conduct any further investigation or review to see if defendants have engaged in other conflicted transactions since this litigation began, and that it does not have any reason to doubt that McClure is being truthful with respect to his current interactions with his advisory clients.

Moreover, it is undisputed that Westport and McClure discontinued the principal transactions in July 2015, and that they disclosed to the Financial Industry Regulatory Authority ("FINRA") that the principal transactions appear to have violated the Advisers Act.[10] Specifically, Westport, through counsel, sent a letter to FINRA in August 2015 stating in part:

> The transactions with the advisory clients appear to fall within the prohibitions of Section 206(3) of the Advisers Act. Those transactions should have been disclosed on both Form ADV Part 1 and Part 2.A for the firm. Counsel has been

---

[9] *See* Doc. #168-1 at 6-7; Doc. #180-1 at 2-3. At oral argument, defendants' counsel represented that Westport would close on April 9, 2021, and that McClure hoped to work as a "line" broker at a new firm, but that he would not have a compliance role or supervisory responsibility.

[10] Doc. #159 at 4-5; Doc. #167 at 3-4.

> gathering information about the number and type of transactions to provide to
> staff of the SEC.[11]

Although the parties dispute the exact circumstances related to this self-disclosure and whether

Westport intended to self-disclose to the SEC before the SEC began an investigation into

Westport, it is clear that Westport ceased this activity and reported it to at least one regulatory

authority before the SEC notified Westport of an investigation. This action does not absolve

defendants' liability for their prior conduct, but it weighs against a finding that defendants are

likely to engage in similar violations of the securities laws in the future.

Defendants have also recognized that they improperly engaged in principal transactions.

At the summary judgment stage, Westport admitted that "[w]hen it acted as a Selling Dealer,

Westport acted as a principal for its own account."[12] At trial, McClure stated "[w]e made a

mistake on our definition of principal trades."[13] As defendants put it at the post-trial stage,

"[d]efendants did engage in principal trading and have recognized it repeatedly."[14]

With respect to the 12b-1 fees, it is concerning that defendants continued to engage in

these transactions after they were notified of the SEC's investigation and until the eve of this

litigation in 2017. *See Westport Capital Markets LLC*, 2020 WL 6270698, at *10. Defendants do

not argue that they self-reported this conflicted stream of income. Still, defendants have, at least,

indicated that they accept their responsibility to reimburse their clients who paid 12b-1 fees.[15]

Although defendants have disputed the adequacy of their disclosures, the reasonableness of their

---

[11] Doc. #159-2 at 8.

[12] Doc. #58-1 at 6 (¶ 11).

[13] Doc. #136 at 167 (Tr. 900).

[14] Doc. #168-1 at 2.

[15] *See* Doc. #159 at 14 ("McClure recognizes his responsibility to reimburse clients who paid 12b-1 fees"). At oral argument, defendants' counsel reiterated that McClure accepts responsibility with regard to the 12b-1 fees.

reliance on a regulatory consultant, and whether they acted with *scienter*, they at least do not maintain that their conduct was fully blameless.

I also find McClure to be sincere when he discusses the dramatic impact that the SEC's enforcement action and the revelation of his unlawful practices have had on him, both financially and emotionally. Westport has lost millions of dollars in business, and McClure's financial circumstances have fallen sharply.[16] I conclude that, under the circumstances in this case, the severe consequences that defendants have already faced for their misconduct weigh against a finding that they are reasonably likely to violate the securities laws in the future.

In addition, the SEC argues that a permanent injunction "would provide support for an administrative proceeding where the [SEC] may suspend or revoke Westport's registration or bar or suspend McClure's association with an advisory or brokerage firm" and would "provide a jurisdictional basis for the Commission to consider whether a revocation, bar, or suspension is in the public interest."[17] But as the SEC recognizes, it already has a statutory predicate to pursue these regulatory sanctions on the basis of the jury's finding that Westport and McClure violated section 207 of the Investment Advisers Act.[18] I decline to impose a permanent injunction simply to provide an additional basis for the SEC to seek future sanctions or because it would provide the statutory predicate that the SEC most often uses to seek those sanctions.

I must also consider the adverse effect that entry of a permanent injunction would have upon defendants. "[T]he collateral consequences of an injunction can be very grave." *SEC v. Commonwealth Chem. Sec., Inc.*, 574 F.2d 90, 99 (2d Cir. 1978); *see also Gentile*, 939 F.3d at 566 (same). Here, the impact on McClure would be severe because it would facilitate

---

[16] Doc. #159 at 5; Doc. #161 at 13-14 (filed under seal).

[17] Doc. #167 at 2.

[18] *Ibid.*

administrative sanctions that would very likely end McClure's career. Of course, such a finding may nonetheless be appropriate to protect the public interest if there is a reasonable likelihood that a defendant would commit future violations of the securities laws. *See, e.g., Fowler*, 440 F. Supp. 3d at 302. But absent such a showing in this case, entry of an injunction would improperly serve punitive rather than deterrent purposes. Accordingly, for all these reasons and in light of my consideration of all the *Cavanagh* factors, I will deny the SEC's motion to the extent that it seeks injunctive relief.

### *Disgorgement and prejudgment interest*

The SEC seeks disgorgement of $632,954 in profits—$546,019 from the selling dealer transactions, and $86,935 from 12b-1 fees—jointly and severally against Westport and McClure, along with an award of prejudgment interest.[19] Westport and McClure do not object to disgorgement of the 12b-1 fees, but they argue that disgorgement is improper as a remedy for the income derived from the selling dealer transactions.[20]

"Disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." *SEC v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014). It is an equitable remedy "imposed to forc[e] a defendant to give up the amount by which he was unjustly enriched." *Ibid*. Further, courts have "broad discretion not only in determining whether or not to order disgorgement but also in calculating the amount to be disgorged." *Ibid.* That amount "need only be a reasonable approximation of profits causally connected to the violation" and any "risk of uncertainty in calculating disgorgement should fall upon the wrongdoer whose illegal conduct created that uncertainty." *Id.* at 305.

---

[19] Doc. #152-1 at 13-22.

[20] Doc. #161 at 7-9.

As the Supreme Court recently confirmed in *Liu v. SEC*, 140 S. Ct. 1936 (2020), "a disgorgement award that does not exceed a wrongdoer's net profits and is awarded for victims is equitable relief permissible under § 78u(d)(5)." *Id.* at 1940; *see also SEC v. Cope*, 2021 WL 653088, at \*2 (S.D.N.Y. 2021) ("[w]hile *Liu* limited to a certain extent the scope of the disgorgement remedy, a district court retains broad equitable power to fashion appropriate remedies for federal securities law violations, including imposing disgorgement.").

Westport and McClure argue that disgorgement is inappropriate for the selling dealer transactions because there is "no reasonable relationship between Defendants' gains—the dealer concession income received from underwriters—and the measure of disgorgement urged by the SEC" and because "the $546,019 in dealer concession income does not constitute an 'investor loss.'"[21] But "investor loss" is not the proper measure for disgorgement; as the Supreme Court made clear in *Liu*, disgorgement is limited to "net profits from wrongdoing after deducting legitimate expenses" and is to be "assessed against only culpable actors and for victims." 140 S. Ct. at 1946; *see also id.* at 1942 ("equity practice long authorized courts to strip wrongdoers of their ill-gotten gains, with scholars and courts using various labels for the remedy. … [T]o avoid transforming an equitable remedy into a punitive sanction, courts restricted the remedy to an individual wrongdoer's net profits to be awarded for victims.").

It is beyond dispute that Westport and McClure earned profits from wrongdoing by engaging in selling dealer transactions, and that these are the profits that the SEC now seeks to disgorge. As I explained in my post-trial ruling, "[t]he SEC's evidence showed that from 2012 to 2015 Westport generated about $550,000 in net income from its sales of syndicated selling dealer shares to its advisory clients; this was income above and beyond the approximate $1.1

_____

[21] Doc. #159 at 8.

million that Westport charged these clients in advisory fees during the same time period." *Westport Capital Markets LLC*, 2020 WL 6270698, at *5. "McClure personally received distributions of nearly $550,000 from 2012 to 2015 as a result of the income generated by Westport from its sale of selling dealer offering shares to its advisory clients." *Ibid*.

The SEC describes this income as "pure profit."[22] Defendants do not dispute that characterization, nor do they argue that any of the SEC's calculations are not "a reasonable approximation of profits causally connected to the violation." *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996). Defendants do not suggest any deductions that should be made for "legitimate expenses." *Liu*, 140 S. Ct. at 1950. Instead, defendants attempt to re-characterize the $546,019 in net income as "net trading losses of 25 Westport clients … over a five-year period."[23] But as described above, the record and the SEC's submissions make clear that the disgorgement request represents income defendants earned when they intentionally or recklessly engaged in selling dealer transactions without legally required disclosures.[24]

Defendants also argue that disgorgement is inappropriate because "none of [the income] came from or was charged to Westport's clients" and because "the income Westport and Mr. McClure derived from the selling dealer offerings was paid by the underwriters."[25] This argument is both inaccurate and immaterial. As I explained in my post-trial ruling, Westport profited directly from its clients in the selling dealer transactions. "Westport would buy for its

---

[22] Doc. #152-1 at 17.

[23] Doc. #159 at 8.

[24] To be sure, the SEC has also argued that some investors "suffered substantial losses" as a result of selling dealer transactions that sold clients speculative investments. Doc. #152-1 at 25. But the SEC bases its disgorgement request on the profit that defendants received from engaging in selling dealer transactions, not on its estimate of how much investors lost through the selling dealer transactions. *Compare* Doc. #47-27 at 6-8 (¶¶ 15-20) (describing and calculating the income defendants received from the markups on selling dealer transactions) *with id*. at 10-11 (¶¶ 25-28) (describing and calculating investor losses as a result of selling dealer transactions).

[25] Doc. #159 at 8 (emphasis omitted).

own account an allocation of initial public syndicated share offerings at a discount from the public offering price and then resell these securities to its advisory clients at the public offering price, earning as it did so a selling concession for the shares that were sold to the clients." *Westport Capital Markets LLC*, 2020 WL 6270698, at *2. Moreover, even if defendants' income had somehow been paid by the underwriters, disgorgement would still be warranted because defendants earned their selling dealer transaction profits through wrongdoing and the funds would be awarded to the investors whose accounts defendants invested in selling dealer transactions without complying with their disclosure obligations.

Furthermore, defendants argue that disgorgement to investors "would be an inequitable windfall in contravention of the Supreme Court's clear holding in *Liu*."[26] This argument finds no support in *Liu*, however, which explains that a "profit-based measure of unjust enrichment" reflects the "foundational principle" that "it would be inequitable that a wrongdoer should make a profit out of his own wrong." 140 S. Ct. at 1943. There is no inequity in requiring defendants to disgorge their profits from their wrongful conduct toward their investors, and the SEC's disgorgement request is consistent with the Supreme Court's guidance in *Liu*.

A disgorgement award must satisfy the "statute's command that any remedy be 'appropriate or necessary for the benefit of investors.'" *Id.* at 1948 (quoting 15 U.S.C. § 78u(d)(5)). The SEC's motion makes clear that it "intends to distribute that disgorgement to defendants' advisory clients who were deprived of truthful disclosures about defendants' conflicted transactions," using contact information for the harmed clients obtained through discovery and subject to supervision by the Court.[27] Defendants do not argue that it is infeasible

---

[26] *Ibid.*

[27] Doc. #152-1 at 20-21.

for the SEC to identify the investors who were affected by the selling dealer transactions or to return the funds to them. Even if it became infeasible for some reason, the Supreme Court did not foreclose disgorgement in that scenario, stating that "[i]t is an open question" whether "the SEC's practice of depositing disgorgement funds with the Treasury may be justified where it is infeasible to distribute the collected funds to investors" consistent with the limitations of 15 U.S.C. § 78u(d)(5). *Ibid*. Moreover, the SEC notes that if disgorgement is infeasible, "it will advise the Court and will seek the Court's approval for its allocation of the collected funds."[28] As a result, ordering disgorgement in this case is consistent with the Supreme Court's decision in *Liu.*

In sum, I conclude that the SEC's disgorgement request is a reasonable approximation of the defendants' net profits from wrongdoing and that an order of disgorgement is warranted under the circumstances in this case.

As to prejudgment interest, whether to grant prejudgment interest on top of disgorgement is also "confided to the district court's broad discretion," a decision "governed by the equities, reflecting considerations of fairness rather than a rigid theory of compensation." *Contorinis*, 743 F.3d at 307-08. Requiring the payment of prejudgment interest on disgorgement amounts "is intended to deprive the wrongdoer of the benefit of holding the illicit gains over time by reasonably approximating the cost of borrowing such gain from the government." *Id.* at 308. "In deciding whether an award of prejudgment interest is warranted, a court should consider (i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved,

---

[28] *Id*. at 21.

and/or (iv) such other general principles as are deemed relevant by the court." *First Jersey Sec., Inc.*, 101 F.3d at 1476.

These factors favor awarding prejudgment interest, and defendants do not offer any reason why prejudgment interest should not be awarded. *See id.* at 1477 (holding that it was appropriate to award prejudgment interest "for the entire period from the time of defendants' unlawful gains to the entry of judgment … [g]iven the remedial purpose of the statute, the goal of depriving culpable defendants of their unlawful gains, and the lack of any unfairness to defendants"). "Requiring payment of interest prevents a defendant from obtaining the benefit of what amounts to an interest free loan procured as a result of illegal activity." *SEC. v. Moran*, 944 F. Supp. 286, 295 (S.D.N.Y. 1996). Awarding prejudgment interest is especially appropriate here in light of the importance of the time value of money for investors.

In addition, the SEC's calculations of prejudgment interest are reasonable and use a generally accepted rate of interest—the IRS underpayment rate.[29] *See First Jersey Sec., Inc.*, 101 F.3d at 1476 ("courts have approved the use of the IRS underpayment rate in connection with disgorgement").

Accordingly, I will grant the SEC's full disgorgement request of $632,954, along with $187,807 in prejudgment interest, for a total disgorgement award of $820,761. I will impose this disgorgement award jointly and severally against Westport and McClure for substantially the reasons stated in the SEC's memorandum of law.[30] Disgorgement can be used to "impose collective liability" when "partners engaged in concerted wrongdoing." *Liu*, 140 S. Ct. at 1949; *see also First Jersey Sec., Inc.*, 101 F.3d at 1475 ("where a firm has received gains through its

---

[29] *Id.* at 22.

[30] *Id*. at 17-20.

18

unlawful conduct, where its owner and chief executive officer has collaborated in that conduct and has profited from the violations, and where the trial court has, within the proper bounds of discretion, determined that an order of disgorgement of those gains is appropriate, it is within the discretion of the court to determine that the owner-officer too should be subject, on a joint and several basis, to the disgorgement order").

Here, joint and several liability is plainly reasonable, and defendants do not offer any argument against it. "McClure owns Westport, and he wears just about every hat of importance in the company: he is the president, chief executive officer, chief financial officer, and chief compliance officer. As the firm's chief compliance officer, McClure is responsible for the accuracy of the firm's financial reports and for understanding what goes into those reports." *Westport Capital Markets LLC*, 408 F. Supp. 3d at 99. It is beyond dispute that Westport and McClure each received substantial benefits from their concerted, wrongful activities. The SEC does not seek to impose joint and several liability on mere "affiliates" or those with "no participation" in an unlawful scheme, *Liu*, 140 S. Ct. at 1949, and it excludes from its disgorgement calculations the fees paid out to Westport's representatives who earned fees on conflicted transactions.[31] Accordingly, I will grant the SEC's request to hold Westport and McClure jointly and severally liable for the entirety of the disgorgement and prejudgment interest award.

### Civil penalties

The SEC also seeks civil penalties against Westport and McClure. The Investment Advisers Act provides that when "any person has violated any provision" of the Act, the court "shall have jurisdiction to impose, upon a proper showing, a civil penalty to be paid by the

---

[31] *See id*. at 17.

person who committed such violation." 15 U.S.C. § 80b-9(e)(1). Congress enacted the civil penalties provisions "to further the dual goals of punishment of the individual violator and deterrence of future violations," finding "that disgorgement insufficiently deters securities laws violations because it merely restores the *status quo ante*." *Official Comm. of Unsecured Creditors of WorldCom, Inc. v. SEC*, 467 F.3d 73, 81 (2d Cir. 2006); *see also SEC v. Illarramendi*, 260 F. Supp. 3d 166, 182 (D. Conn. 2017) ("disgorgement alone is plainly an insufficient remedy. To limit the penalty for fraud to disgorgement is to tell a violator that he may commit fraud with virtual impunity: if he gets away undetected, he can keep the proceeds, but if caught, he simply has to give back the profits of his wrong."), *aff'd*, 732 F. App'x 10 (2d Cir. 2018).

There are three tiers of civil penalties that are available for "each violation" of the Investment Advisers Act. Second-tier penalties apply if a violation "involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement." 15 U.S.C. § 80b-9(e)(2)(B). Third-tier penalties apply if, in addition to the second-tier requirements, "such violation directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons." *Id*. § 80b-9(e)(2)(C). A civil penalty must be imposed separately against each defendant and cannot be imposed jointly and severally. *See SEC v. Pentagon Capital Mgmt. PLC*, 725 F.3d 279, 288 (2d Cir. 2013)*.*

The SEC seeks second-tier civil penalties of $375,000 for Westport and $75,000 for McClure for their violations related to the 12b-1 fee transactions and third-tier civil penalties of $725,000 for Westport and $150,000 for McClure for their violations related to the selling dealer transactions.[32] These civil penalties represent the maximum civil penalties against Westport and

---

[32] *Id*. at 23-26.

McClure, respectively, for one second-tier violation for the 12b-1 fee transactions and one third-tier violation for the selling dealer transactions.[33]

"The amount of the penalty shall be determined by the court in light of the facts and circumstances." 15 U.S.C. § 80b-9(e)(2)(A). Therefore, district courts have a "broad mandate" to fashion civil penalties, and in determining whether a penalty should be imposed and the amount of the penalty look to factors "including (1) the egregiousness of the defendant's conduct; (2) the degree of the defendant's scienter; (3) whether the defendant's conduct created substantial losses or the risk of substantial losses to other persons; (4) whether the defendant's conduct was isolated or recurrent; and (5) whether the penalty should be reduced due to the defendant's demonstrated current and future financial condition." *SEC v. Rajaratnam*, 918 F.3d 36, 44 (2d Cir. 2019).

The first four factors weigh heavily in favor of significant civil penalties in this case. As I have already detailed, defendants' violations were egregious and recurrent. The "evidence showed that Westport and McClure pervasively engaged in conflicted selling dealer and 12b-1 fee transactions for several years and that they earned hundreds of thousands of dollars from doing so." *Westport Capital Markets LLC*, 2020 WL 6270698, at *12. "More than 1,000 of these selling dealer transactions were engaged in for advisory clients under McClure's personal

---

[33] Specifically, they represent the maximum penalties that apply for a "natural person" (McClure) and "any other person" (Westport) for violations that occurred between March 4, 2009 and March 5, 2013, even though somewhat higher maximum penalty amounts would apply if the violations were counted as occurring beginning March 6, 2013. *See* SEC, Inflation Adjustments to the Civil Monetary Penalties Administered by the Securities and Exchange Commission, available at https://www.sec.gov/enforce/civil-penalties-inflation-adjustments.htm [https://perma.cc/2Z4U-JPHP] (last accessed July 6, 2021). Although the SEC only seeks a penalty for each *type* of unlawful transaction, each *transaction* itself could be deemed a violation for penalty purposes. *See Pentagon Capital Mgmt. PLC*, 725 F.3d at 288 n.7 ("we find no error in the district court's methodology for calculating the maximum penalty by counting each late trade as a separate violation"); *Illarramendi*, 260 F. Supp. 3d at 183 ("district courts have the discretion to calculate penalties based on each violative act. Courts may look to either the number of violative transactions or the number of investors to whom illegal conduct was directed," but may also, in other cases, "focus[] on the fact that there was one fraudulent scheme, even though there were many individual violations.").

management." *Id*. at *5. The jury found that Westport and McClure acted with *scienter* with respect to both the selling dealer transactions and 12b-1 fees, concluding that the SEC proved both Westport and McClure "acted intentionally or recklessly" when they failed to disclose the compensation they received from both 12b-1 fees and selling dealer transactions. *Id*. at *10. And defendants not only profited from the selling dealer transactions at their clients' expense, but they "invest[ed] a large proportion of [certain] clients' accounts in mostly speculative and unrated selling dealer offerings" despite "instructions … to invest their money conservatively"— which both caused actual losses for some clients and put other clients at the risk of substantial losses. *Id.* at *5 n.8, *12.

With respect to the fifth factor based on financial conditions, defendants argue "neither Westport nor Mr. McClure possesses the ability to pay the majority of [the] disgorgement requested by the SEC or a civil penalty[,]" and that "their inability to pay will only intensify following the entry of a final judgment."[34] Defendants submit extensive financial records demonstrating that both Westport and McClure have significantly weakened financial positions.[35]

I find that substantial civil penalties are warranted overall, but I will order civil penalties at levels somewhat below the SEC's request to account for defendants' financial circumstances. The SEC does not dispute that defendants lack the present ability to pay a substantial financial penalty, and it is appropriate to reduce the civil penalties as a result of their financial conditions.

At the same time, I will not go as far as defendants urge by eliminating the civil penalties altogether. McClure's filings show that he still has assets, including significant equity in

---

[34] Doc. #159 at 12.

[35] *See* Doc. #161 (financial records filed under seal).

Westport, and that he has earned significant income even while this litigation was ongoing.[36] McClure also has substantial future earning potential, including—for example—a conditional agreement with another financial firm that could pay him up to $336,000 in referral fees over two years if McClure is unable to maintain his securities licenses due to future government action.[37]

In addition, it is clear from the financial filings that Westport and McClure historically earned considerable income while engaging in pervasive violations of the securities laws, despite their reduced current assets. I am concerned about the broader deterrent message it sends if high-income investment advisors can skim hundreds of thousands of dollars from clients over many years in violation of securities laws, spend down those profits (including by paying for litigation involving weak defenses in order to delay the day of reckoning), and then claim poverty to eliminate the financial penalty they have to pay. As Judge Lynch has suggested, "to withhold the remedy of disgorgement or penalty simply because a swindler claims that she has already spent all the loot and cannot pay would not serve the purposes of the securities laws," and "[a]n order of disgorgement and civil penalty are both proper remedies in this case; the future will tell whether the SEC can find assets to levy upon." *SEC v. Inorganic Recycling Corp.*, 2002 WL 1968341, at *4 (S.D.N.Y. 2002) (Lynch, J.).

In light of similar concerns, courts routinely award substantial civil penalties—along with disgorgement—when defendants commit numerous violations of the securities laws with *scienter*, even if it unclear that defendants will be able to pay such judgments. *See, e.g., SEC v. Nadel*, 2016 WL 639063, at *26 (collecting cases and ordering disgorgement, prejudgment

---

[36] *See, e.g.*, Doc. #161-2 at 4-5, 164 (financial records filed under seal).

[37] Doc. #168-1 at 7; Doc. #168-2.

interest, and a $1 million third-tier civil penalty despite defendant's "distressed financial condition" when conduct—including unlawful principal transactions—"was egregious, deliberate, and resulted in the risk of significant losses and continued for a span of several years"), *report and recommendation adopted*, 206 F. Supp. 3d 782 (E.D.N.Y. 2016).

As a result, I reject defendants' argument that "the civil penalties requested by the SEC are not necessary to punish Defendants or to deter future violations of the securities laws."[38] I conclude that a meaningful civil penalty is warranted in light of the factors discussed above, particularly the pervasiveness and severity of the defendants' violations and the jury's findings of *scienter*, and that Westport and McClure should not be able to escape the financial consequences of their actions because their assets are presently depleted.

Defendants also argue that "the level of civil penalties requested by the SEC here is grossly disproportionate to the penalties imposed in any other reported case involving principal transactions."[39] But as the SEC argues in reply, defendants rely principally on settled administrative proceedings rather than those with jury findings of *scienter*.[40] The SEC's request is not out of step with civil penalties awarded in other cases in which defendants are found to have engaged in extensive violations of the securities laws with *scienter. See, e.g., Nadel*, 2016 WL 639063, at *26. Additionally, the SEC's request is far below the maximum civil penalties that could be ordered in this case if each conflicted transaction were treated as a separate violation.

Accordingly, I will impose second-tier civil penalties of $200,000 for Westport and $50,000 for McClure for their violations related to the 12b-1 fee transactions, and I will impose

---

[38] Doc. #159 at 10.

[39] *Ibid*. (emphasis omitted).

[40] Doc. #167 at 10.

third-tier civil penalties of $300,000 for Westport and $150,000 for McClure for their violations related to the selling dealer transactions, for total civil penalties of $500,000 against Westport and $200,000 against McClure. These civil penalties are not subject to joint and several liability.

## CONCLUSION

For the reasons set forth above, the Court GRANTS in part and DENIES in part the SEC's motion for entry of final judgments against Westport and McClure (Doc. #152). The SEC's request for injunctive relief is denied. The SEC's disgorgement request is granted in its entirety. Westport and McClure are jointly and severally liable for disgorgement of $632,954, along with $187,807 in prejudgment interest, for a total disgorgement amount of $820,761. The SEC's civil penalties request is granted in part, and the Court imposes total civil penalties of $500,000 against Westport and $200,000 against McClure.

Final judgments against both defendants are attached to this ruling. The Clerk of Court shall close this case.

It is so ordered.

Dated at New Haven this 6th day of July 2021.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge